ALVIN V. GRAFF, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3958–77.     Filed July 21, 1980.

*Robert L. Trimble*, for the petitioner.
*John W. Dierker* and *Alan C. Levine*, for the respondent.

SIMPSON, *Judge:* The Commissioner determined deficiencies in the petitioner's Federal income taxes of $81,931.43 for 1973 and $1,429.80 for 1974. He also determined an addition to tax of $4,096.57 for 1973 under section 6653(a) of the Internal Revenue Code of 1954,[1] but he now concedes that the petitioner is not liable for such addition to tax. After concessions by the parties, the issues for decision are: (1) Whether the interest reduction payments made on behalf of the petitioner under Section 236 of the National Housing Act are taxable to him as income, and whether the portions allocable to interest are deductible under section 163; (2) whether the Commissioner of Internal Revenue should be estopped from assessing and collecting the deficiencies arising from the taxation of such interest reduction payments because of the representations made to the petitioner by officials at HUD and FHA concerning the tax treatment of such payments; and (3) whether the minimum tax on items of tax preference under section 56 is constitutional, or in the alternative, whether such tax represents a deductible excise tax.

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioner, Alvin V. Graff, resided in Dallas, Tex., at the time he filed the petition in this case. He filed his individual Federal income tax returns for 1973 and 1974 with the Internal Revenue Service Center, Austin, Tex.

At the time of the trial in this case, the petitioner was the owner of a low and moderate income housing project in Irving, Tex., known as the Park Grove Square Apartments (the project).

---

[1] All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue, unless otherwise indicated.

The project contained approximately 200 garden-type apartments and accessory buildings. The petitioner built the project under the provisions of Section 236 of the National Housing Act (Section 236), which provided for certain incentives for the builders and sponsors of low and moderate income housing projects. Such incentives included a provision under which HUD made interest reduction payments on behalf of the sponsor to reduce his cost of borrowing money for the construction of the project.

The petitioner first considered building the project after he was approached by Edward J. Dee, the director of the Dallas Office of the Federal Housing Administration (FHA), a division of the United States Department of Housing and Urban Development (HUD). HUD was the department of the Federal Government responsible for administering housing projects under Section 236. Mr. Dee told the petitioner that HUD was anxious to have a Section 236 project built in the Irving area, and he asked the petitioner to build such a project on the 400 acres of land which he owned in Irving. At first, the petitioner was hesitant to accept the proposal to build an apartment complex since he had never met Mr. Dee before and since he was unfamiliar with the Section 236 program. In addition, he had never contemplated building an apartment complex on his land.

Mr. Dee met with the petitioner several times to urge him to build such a project, and he represented that there were numerous tax advantages for the sponsor of a Section 236 project. He told the petitioner that he would be able to deduct from his taxable income the interest payments made by HUD on his behalf. Mr. Dee never mentioned to the petitioner that the amount of such payments would be includable in his gross income. He told the petitioner that the sponsors of Section 236 projects received such beneficial tax treatment because Congress intended that such tax advantages serve as an incentive for builders of low and moderate income projects.

After Congress enacted the Section 236 program, officials of HUD from Washington (including the Under Secretary of the department) conducted regional meetings to explain the tax incentives available to builders and sponsors of such projects. Mr. Dee and his fellow administrative officers at the Dallas office of FHA were advised at such regional meetings that the interest payments by HUD on behalf of a sponsor of a Section

236 project were deductible by the sponsor without a corresponding inclusion of such amount in his income. Mr. Dee and Jake H. Waddle, the Deputy Director of the FHA Office in Dallas at that time, conducted meetings in many cities in Texas to explain the Section 236 program to potential sponsors. At such meetings, both men represented that a sponsor of such a project would receive the benefit of the interest deductions without a corresponding inclusion in his income.

In 1969, the petitioner filed an application to sponsor a Section 236 project. He later hired John Huddleston, who had worked for HUD and FHA as an appraiser from 1961 to 1968, to assist him in evaluating the Section 236 project. When the petitioner and Mr. Huddleston inquired once again about the tax treatment of the interest payments by HUD, they were again assured that the official position of HUD and FHA was that such payments would be fully deductible by the petitioner and that such payments would not be includable in his income. Consequently, the petitioner agreed to build the Section 236 project on his property. He agreed to undertake the project in part because of the tax benefits he expected to receive. However, the petitioner never consulted a tax attorney regarding the tax consequences of the Section 236 program.

On or about May 18, 1970, FHA issued a commitment to the Housing America Mortgage Co., Inc. (Housing America), as mortgagee, for insurance advances under Section 236 in the principal amount not to exceed $2,910,600. Such commitment was for the petitioner's Section 236 project, and his name appeared on the document as the sponsor of the project and as the proposed mortgagor. On or about May 25, 1970, Housing America assigned the commitment to Farm and Home Savings Association (Farm and Home), a Missouri corporation having an office and place of business in Dallas. On June 1, 1970, Farm and Home loaned the $2,910,600 to the petitioner at interest of 8½ percent per year. Such loan was evidenced by a promissory note and secured by a deed of trust on the project. Farm and Home then became the mortgagee of record. The petitioner's name appeared as the maker of the promissory note and as the grantor of the deed of trust which secured the project as collateral for the mortgage.

On or about June 1, 1970, the petitioner entered into a regulatory agreement with HUD in which he agreed to make all

payments due under the note and mortgage to Farm and Home, and HUD agreed to make a portion of those payments to Farm and Home on behalf of the petitioner in accordance with such regulatory agreement, Section 236, and the Federal regulations promulgated thereunder. During 1971, Farm and Home transferred the note and deed of trust for the petitioner's project to the Federal National Mortgage Association (FNMA).

During 1973, the total payments on the mortgage on the petitioner's project were $270,394.91, which consisted of $11,106.19 payment of principal, $244,943.09 payment of interest, and $14,345.63 as premium for mortgage insurance. Of such total, HUD paid $179,868.71, and the petitioner paid $90,526.20. During 1974, the total payments on the mortgage on the petitioner's project were $270,191.21, which consisted of $12,087.88 payment of principal, $243,820.99 payment of interest, and $14,282.34 as premium for mortgage insurance. Of such total, HUD paid $179,805.42, and the petitioner paid $90,385.79.

On his individual Federal income tax return for 1973, the petitioner deducted $130,638.43 as interest paid with respect to his Section 236 project during such year. On his return for 1974, he deducted $121,910.50 as interest paid with respect to such project during that year. Subsequently, his returns for such years were audited by the Internal Revenue Service, and he was informed that the deductions for the interest payments which were made by HUD were being disallowed. The petitioner called Mr. Dee to clarify what he had been told regarding the interest deduction before he undertook the project. Mr. Dee wrote to the petitioner in December 1976 and reiterated that, as the Section 236 program had been explained to him, sponsors of such projects would be allowed a deduction for interest payments made by HUD on their behalf. Mr. Dee wrote to the petitioner again in October 1977 and stated that he never told the petitioner that there would be a corresponding inclusion in his income for the amount of the interest payment deducted under a Section 236 project. Mr. Dee stated:

As I explained to you in our recent telephone conversation, and as I attempted to explain in my letter to you last December, 1976, the interest deduction on your property in Irving, Texas, was granted to you as an incentive to induce you to construct the project just like the interest subsidy was also an incentive.

As I told you before you agreed to go forward with the project, this was an

incentive, and at no time was anything ever mentioned that this would be brought into gross income.

It just wouldn't of made much sense to tell you that this was entirely a tax deductible item granted as an incentive and then later tell you it is brought in as gross income. This is just not the way the program was set out to began [sic] with. At no time did I ever mention to you that this tax incentive item would be brought in an offset by calling it gross income, obviously the tax incentive would be gone and there then would be no incentive what-so-ever.

Prior to the audit by the IRS, the petitioner was never informed by HUD or FHA that he was incorrect in assuming that he would be allowed an interest deduction without a corresponding inclusion in income for the paynents made by HUD on his behalf.

In his notice of deficiency, the Commissioner disallowed the petitioner's deduction of the interest payments made by HUD on his behalf under Section 236 during the years in issue. However, in his amended answer, the Commissioner now maintains that if the petitioner is allowed to deduct the payments made by HUD on his behalf, then such amounts are includable in his income. The Commissioner also determined that the petitioner was liable for the minimum tax on items of tax preference consisting of accelerated depreciation on real property and capital gains for 1973 and 1974.

## OPINION

The major issue in this case is whether the interest reduction payments made by HUD on behalf of the petitioner are includable in his gross income under section 61. It is the petitioner's position that he is entitled to deduct the interest payments made by HUD on the mortgage of the section 236 project and that the interest reduction payments are not includable in his gross income because such payments were in the nature of Government subsidies or general welfare benefits which are exempt from taxation. He also maintains that he received no benefit by reason of such payments since he was not obligated to make them, and since they were made under an obligation running from HUD to the mortgagee. The Commissioner now concedes that the interest payments made on behalf of the petitioner are deductible, but he vigorously contends that the interest reduction payments are includable in the petitioner's gross income.[2]

---

[2]The petitioner moved to shift the burden of proof since the Commissioner amended his answer. By that amendment, the Commissioner did assert as an alternative position that if the

The issue presented to us for decision is one which will have broad impact over a number of years.[3] In order to fully comprehend the issue, it is necessary to describe the background and operation of the Section 236 program. We will also briefly examine the program established under Section 235 of the National Housing Act (Section 235), a companion program operated by HUD to encourage home ownership by low and moderate income residents.

Section 236 was added to the National Housing Act by section 201 of the Housing and Urban Development Act of 1968, Pub. L. 90-448, 82 Stat. 498, 12 U.S.C. sec. 1715z-1. Section 236 provided a variety of incentives to encourage the construction of rental and cooperative housing for low and moderate income families. To qualify for such benefits, a sponsor had to be organized as a profit-making corporation, had to be organized for the sole purpose of providing housing, and had to be restricted to a maximum return of 6 percent on initial equity investment in the project. The incentives included Federal insurance of private long-term (40-year) mortgage loans in an amount not in excess of 90 percent of the FHA-determined certified cost of housing projects.

In addition, Section 236 provided for monthly Federal interest reduction payments made by HUD directly to the private mortgagee on behalf of the sponsor-mortgagor. In practice, the sponsor contracted with private sources and secured a mortgage at the current market rate. HUD then made a contract with the mortgagee under which it made the interest reduction payments

interest payments are found to be deductible, they are includable in income. As to that alternative position, the Commissioner does bear the burden of proof, and the petitioner's motion will be granted. Rule 142, Tax Court Rules of Practice and Procedure. However, the Commissioner's burden extends only to that alternative position (*Estate of Falese v. Commissioner*, 58 T.C. 895 (1972)), and that position rests on a legal conclusion by the Court as to the deductibility of the payments since no evidence is required to establish that fact.

[3] "As of March 31, 1976, HUD was responsible for overseeing the administration of 3,601 section 236 projects * * *

"On January 5, 1973, HUD suspended the section 236 program along with other federally assisted housing programs. However, considerable expenditures under the program will continue for many years because of the large number of units already operating under the program. HUD estimates that interest reduction payments on existing projects could amount to about $10.3 billion over the remaining life of these project mortgages [Comp. Gen. Rept. to Congress, "Little Accomplished in Insuring that Proper Rents are Charged under the Section 236 Rental Assistance Housing Program," p. 2 (Oct. 5, 1976).]"

See also *Commonwealth of Pennsylvania v. Lynn*, 501 F.2d 848 (D.C. Cir. 1974).

each month directly to the mortgagee in an amount equal to the difference between the payment required under the mortgage for principal, interest, and mortgage insurance and the payment that would have been required for principal and interest under a mortgage bearing interest at 1 percent.

In connection with the enactment of Section 236, the Internal Revenue Code was also amended to provide several tax benefits for sponsors of Section 236 projects. For example, section 167 allows the owner of a Section 236 project to take advantage of the 200-percent double declining balance method of depreciation; section 1250(a)(1)(C)(ii) provides Section 236 housing with special treatment regarding depreciation recapture; and section 1039 specifically allows the owner of a Section 236 project to defer paying taxes on the gain from the sale of such project upon certain conditions. See HUD, "Housing in the Seventies," A Report of the National Housing Policy Review 40–41 (Nov. 1974).

A sponsor of a Section 236 project was required to enter into an agreement with HUD regulating the rents to be charged the tenants. The "basic rental charge" for a tenant was determined as if the project were operated by the sponsor under a mortgage calling for 1-percent interest.[4] The tenant was required to pay either the basic rental charge or 25 percent of his income, whichever was greater. However, in no event could the rental charge exceed the fair market rental determined on the basis of operating the project without any Federal assistance in the form of interest reduction payments. Any rentals collected by the sponsor in excess of the basic charges were returned to HUD for deposit in a revolving fund for the purpose of making other interest reduction payments.[5] The family income of the tenants

---

[4]Basic rent is the rent necessary to recover housing operating costs, construction costs, and a limited profit financed under a mortgage having an interest rate of 1 percent. Comp. Gen. Rept. to Congress, "Little Accomplished in Insuring that Proper Rents are Charged under the Section 236 Rental Assistance Housing Program," p. 1(Oct. 5, 1976).

[5]"The Housing and Community Development Act of 1974, enacted in August 1974, eliminated HUD's authority to use excess rents to make interest reduction payments. The 1974 act authorized HUD to use excess rents to pay operating subsidies for section 236 projects. * * * however, HUD has decided not to use the excess rents collected for this purpose. * * * [Comp. Gen. Rept. to Congress, "Little Accomplished in Insuring that Proper Rents are Charged under the Section 236 Rental Assistance Housing Program," p. 2 (Oct. 5, 1976).]"

was reexamined every 2 years, and the rent charged the tenants was adjusted accordingly.

Section 236 replaced the program established under section 221(d)(3) of the National Housing Act of 1961 (12 U.S.C. sec. 1715*l*). That program was designed to provide rental and cooperative housing for families whose incomes were too high for public housing but too low for standard housing available on the market. Section 221(d)(3) provided for 3-percent financing of low and moderate income housing. However, the program depended upon direct Federal lending from the special assistance funds of FNMA to provide the 3-percent mortgages. In order to fully meet the housing goals contemplated by the Housing and Urban Development Act of 1968, it was considered necessary to obtain financing from the private mortgage market. Section 236 was intended to fulfill that objective, since, under that section, the sponsors were required to secure financing in the private mortgage market. See HUD, *supra* at 111–119; G. Pearson, "Low Income Housing: Section 236 of the National Housing Act and the Tax Reform Act of 1969," 31 U. Pitt. L. Rev. 443 (1970); J. Halperin & S. Tucker, "Low Income Housing (FHA 236) Programs: One of Few Tax Shelter Opportunities Left," 36 J. Tax. 2 (1972).

Section 101 of the Housing and Urban Development Act of 1968, 82 Stat. 477, 12 U.S.C. sec. 1715z, added Section 235 to the National Housing Act providing for a homeownership assistance program for low and moderate income families. Such assistance was provided by HUD paying part of the costs of a mortgage obtained by the homeowner in the private mortgage market. Such payments by HUD equaled the difference between 20 percent of the family's adjusted monthly income and the required monthly payment under the mortgage for principal, interest, taxes, mortgage insurance, and hazard insurance. However, in no case could the payment exceed the difference between the required payment under the mortgage for principal, interest, and mortgage insurance and the payment that would be required for principal and interest if the mortgage bore an interest rate of 1 percent. HUD, *supra* at 104–111.

Since the enactment of Sections 235 and 236, the Internal Revenue Service has issued several rulings and regulations regarding the tax treatment of the payments made by HUD under such programs. Rev. Rul. 75–271, 1975–2 C.B. 23, released

June 18, 1975, stated that payments made under Section 235 on behalf of individual homeowners were in the nature of general welfare and, as such, are not includable in the individuals' gross incomes. In March 1976, section 1.163–1(d), Income Tax Regs., was promulgated, and such regulation stated that no interest deduction is allowable for payments made to assist individuals under Section 235. Such regulation was made applicable to taxable years beginning after December 31, 1974. Prior to the issuance of Rev. Rul. 75–271 and section 1.163–1(d), Income Tax Regs., the IRS position regarding the taxability to homeowners of Section 235 payments was undecided. Initially, the IRS took the tentative position that payments under Section 235 were not taxable to the homeowners on whose behalf the payments were made, and that the homeowners could take an interest deduction for such payments. 7 CCH 1972 Stand. Fed. Tax Rep. par. 6525.

In Rev. Rul. 76–75, 1976–1 C.B. 14, the IRS set forth its position with regard to the tax treatment of the payments made by HUD on behalf of sponsors of Section 236 projects. Such ruling concluded that the interest reduction payments under Section 236 were includable in the sponsor's income since such payments made up the difference between the fair rental value of the apartments and the rent actually paid by the low and moderate income tenants. The ruling stated that such payments are treated as if they were received by the sponsor as rent and subsequently paid to the mortgagee as part of the interest due under the mortgage obligation. The ruling also held that the interest payments made under Section 236 were deductible as interest by the sponsor and that his basis in the property is not reduced as a result of any such payments. However, the ruling was not applied only to the taxable years after its release.

To resolve the question of whether the interest reduction payments are includable in the petitioner's gross income, we have scrutinized the legislative history surrounding the enactment of Sections 235 and 236. H. Rept. 1585, to accompany H.R. 17989, 90th Cong., 2d Sess. (1968); S. Rept. 1123, to accompany S. 3497 (Pub. L. 90–448), 90th Cong., 2d Sess. (1968); Conf. Rept. 1785, to accompany S. 3497 (Pub. L 90–448), 90th Cong., 2d Sess. (1968). Under general principles of tax law, such payments are taxable to the petitioner. He was the owner of the project; he secured the mortgage on it; and initially, he was obligated to make the payments under such mortgage. When HUD under-

took to, and did make, part of such payments on his behalf, he benefited as the owner of the project, and he benefited since he was relieved of his legal obligation to make such payments. The receipt of such benefits causes such payments to be includable in his gross income. See, e.g., *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426 (1955); *United States v. Hendler*, 303 U.S. 564 (1938); *Old Colony Trust Co. v. Commissioner*, 279 U.S. 716 (1929). Our examination of the legislative history shows no reason to exempt the petitioner from the taxation of the interest reduction payments.

Careful consideration of the nature, function, and operation of the interest reduction payments as reflected in the statute itself, the House and Senate reports, and statements made during the congressional consideration of the Section 236 program lead us to conclude that such payments were intended to be a substitute for rent which the sponsor would otherwise have collected from the tenants. Indeed, the statement of congressional purpose of Section 236 was clearly set forth in the first few words of the statute: "For the purpose of *reducing rentals* for lower income families, the Secretary is authorized to make * * * interest reduction payments on behalf of the owner." (12 U.S.C. sec. 1715z–1(a) (1968); emphasis added.) The committee reports also indicate that the general purpose of the interest reduction payments was to reduce the ultimate rent paid by the tenants. H. Rept. 1585, *supra* at 21; S. Rept. 1123, *supra* at 23. Similar declarations of legislative purpose were made by numerous members of Congress during the debates on the legislation. See Statements of Congressmen Wright Patman, Henry S. Reuss, Fernand J. St. Germain, Henry B. Gonzalez, 114 Cong. Rec. 20062, 20075, 20076, 20095 (July 8, 1968).

The interest reduction payments made on behalf of the sponsor reduced the total operating costs of a Section 236 project by lowering, in effect, the rate of interest on the sponsor's mortgage to 1 percent, thus enabling the sponsor to charge lower rents to the tenants. See *Abrams v. Hills*, 547 F.2d 1062, 1065 (9th Cir. 1976). To ensure that the tenants benefited from the Section 236 program, the rents charged by the sponsor were controlled and if he actually collected rents in excess of those needed to cover his costs, the excess had to be paid over to HUD for use in other projects. H. Rept. 1585, *supra* at 22; S. Rept. 1123, *supra* at 23. Thus, the tenant was intended to be the

ultimate beneficiary of the interest reduction payments, and the benefit received by him is in the nature of welfare not taxable to him. See, e.g., *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 855 (1975); Rev. Rul. 75–271, 1975–2 C.B. 23. However, it was assumed that the sponsor constructed the project for business purposes and that he expected to make a limited profit from its operation. These considerations furnish no reason to believe that the sponsor was to receive a benefit in the nautre of welfare.

The congressional consideration of Section 236 was extensive. However, neither the statute nor any of the committee reports contain any specific reference to the tax treatment of the interest reduction payments. The only statement dealing specifically with such subject was made by Congressman William A. Barrett when the bill was before the House; he said:

> Because of newness of this approach, some question may come up about the treatment of this assistance with respect to the Federal income tax and Federal welfare programs. The fact that the assistance payments under the homeownership program are made on behalf of the homeowner would not, of course, render them includable in the homeowner's income for Federal tax purposes or for determining eligibility or the amount of benefits to be received under federally run or aided programs. Likewise, neither would interest reduction payments made pursuant to the new rental program or rent supplement payments be taxable to the tenants on whose behalf they are made *or to the project owners*. Similarly, these latter types of assistance would not be includable in income for the purpose of such welfare programs. [114 Cong. Rec. 20069 (July 8, 1968); emphasis added.]

Notwithstanding our respect for the members of Congress, we have concluded that the statement by Congressman Barrett does not represent the purpose of Congress. As the Supreme Court recently stated: "The remarks of a single legislator, even the sponsor, are not controlling in analyzing legislative history." *Chrysler Corp. v. Brown*, 441 U.S. 281, 311 (1979). Any attempt to exempt the interest reduction payments from taxation would have constituted significant departure from the general principles of taxation, and we are confident that if Congress had wished to modify the law in such a significant manner, it would have done so by enacting legislation. As a part of the Housing and Urban Development Act of 1968, Congress did decide to furnish several tax incentives for sponsors of Section 236 projects, and to provide those incentives, it amended the Internal Revenue Code. See, e.g., secs. 167, 1039, 1250(a)(1)(C)(ii).

It seems clear that if Congress had intended for the interest reduction payments to be exempt from taxation, it would also have done so by an amendment to the Internal Revenue Code.

In addition, the Ways and Means Committee of the House of Representatives has the responsibility for considering amendments of the Internal Revenue Code. Rule X cl. 1(v)(3), House Rules and Manual sec. 691 (1979). Had an exemption of the interest reduction payments been proposed as a matter of legislation, it would have been considered by that committee, and that committee could have weighed the advantages to be secured by any such exemption against the loss of revenue and made a judgment of whether the exemption was in the public interest. There is no evidence that the statement by Congressman Barrett received such careful and deliberate consideration. Although he was chairman of the Subcommittee on Housing of the Committee on Banking and Currency and was a manager of the Housing and Urban Development Act of 1968 for the House of Representatives, he was not a member of the Ways and Means Committee and was not speaking for that committee. Moreover, his statement is not consistent with the general principles of taxation, nor is it required by the other declarations of the policies of Section 236. For these reasons, we have decided that the statement by Congressman Barrett does not warrant the exemption of the interest reduction payments.

In support of his position, the petitioner also argues that Congress sought to encourage sponsors to construct Section 236 projects by offering them a variety of tax incentives. We have recognized that Congress did in fact make use of tax incentives. However, those tax incentives were provided by the specific amendments of the Internal Revenue Code, and there is no indication that Congress meant to provide other tax incentives. The commentators have recognized that tax incentives did encourage the construction of Section 236 projects, but they consider the significant incentives to be those provided by amendment of the Internal Revenue Code. See M. Cenatiempo, "Tax Advantages Under Section 236 of the National Housing Act," 8 Hous. L. Rev. 911 (1971); J. Halperin & S. Tucker, "Low Income Housing (FHA 236) Programs: One of Few Tax Shelter Opportunities Left," 36 J. Tax. 2 (1972); L. Kaster, "Subsidized Housing: Facts Versus Tax Projection," 26 Tax Law. 125, 127 (1972); G. Pearson, "Low Income Housing: Section 236 of the

National Housing Act and the Tax Reform Act of 1969," 31 U. Pitt. L. Rev. 443, 450–456 (1970).

The petitioner also contends that Sections 235 and 236 were intended to be companion programs and that since the interest reduction payments made to families under the homeownership program of Section 235 are not taxed as income, the interest reduction payments made on behalf of sponsors of Section 236 projects are likewise not taxable. It is true that the programs were intended to complement each other. See, e.g., H. Rept. 1585, *supra* at 24; S. Rept. 1123, *supra* at 23, 26. However, the purpose of the interest reduction payments under Section 236 was fundamentally different from that under Section 235. The payments made under Section 235 directly benefited low and moderate income families who were not capable of homeownership without assistance payments by the Federal Government. As such, the payments are treated as any other form of Government subsidy or benefit which is exempt from taxation. See *United Housing Foundation, Inc. v. Forman*, 421 U.S. at 855; Rev. Rul. 75–271, *supra*. On the other hand, the ultimate beneficiaries of the Section 236 program were the tenants who were enabled to secure housing at rents below the market rates. See *Abrams v. Hills*, 547 F.2d at 1065. The payments under Section 236 were not designed to provide subsidies for sponsors of those projects for such sponsors are not in need of Government assistance.

In support of his position, the petitioner relies on two decisions by the Supreme Judicial Court of Massachusetts, *Morville House Inc. v. Commissioner of Corps. & Tax.*, 369 Mass. 928, 344 N.E.2d 878 (1976), and *Rosenthal v. Commissioner of Corps. & Tax.*, 369 Mass. 939, 344 N.E.2d 884 (1976). In those cases, the court held that under Massachusetts law, the interest reduction payments made by HUD were not includable in the gross income of the owner of a Section 236 project.

In *Morville House*, the Commissioner of Corporations and Taxation for Massachusetts treated the interest reduction payments as an element of gross income. He maintained that an economic benefit which constituted taxable income had been constructively received by the plaintiffs through the discharge by the Federal Government of part of their obligation to the mortgagees. In rejecting such contention, the Massachusetts court first stated that "government subsidies generally are not

considered as generating taxable income to the recipient of the economic benefit." 344 N.E.2d at 881. The tenants of the Section 236 projects, observed the court, receive an economic benefit in the form of reduced rents, which is analogous to any other nontaxable Government subsidy. The court then stated at 882:

By a logical extension of this reasoning, we conclude that the economic benefit realized by the plaintiffs (the reduction in their operating costs through payment of interest on the mortgages at the rate of one per cent a year) is not "translatable into an amount of taxable income." *Trustees of Amherst College v. Commissioner of Corps. & Taxation*, 354 Mass. 503, 507, 238 N.E. 2d 351, 354 (1968).

We cannot agree with the court's perception of the Section 236 program. We have already recognized that the ultimate beneficiaries of such program are the tenants and that the benefit received by them is not taxable. Nevertheless, we cannot agree that the "logical extension of this reasoning" is that the project sponsors also receive a nontaxable benefit from the payments. The interest reduction payments took the place of rents that otherwise would have been charged the tenants. As such, the payments were a substitute for rent. The payments were made to induce the owner to construct the Section 236 project and to allow the tenants to occupy the apartments at reduced rents; in authorizing such payments, there was no intention of providing the owner a benefit in the nature of a subsidy or in the form of public welfare which should not be taxed. To state that "the economic benefit realized by the plaintiffs * * * is not 'translatable into an amount of taxable income'" (344 N.E.2d at 882) ignores the function of the payments.

As a second ground for its holding, the Massachusetts court stated that "the plaintiffs do not receive the 'interest reduction payments,' nor are they allowed to receive them under Federal law." (344 N.E.2d at 882; fn. ref. omitted.) The court stated at pages 883–884:

If we examine the Federal scheme for providing "interest reduction payments" to the mortgagees, we are impressed most by the nexus between securing mortgage insurance and the receipt of these payments. This scheme indicates that, while "project" investors are intimately involved in and certainly interested in securing insurance from the Federal government for the mortgage they give, the essential contract aspects of approval of an insurance application are a matter which the mortgagee and the Federal government must work out.

\* \* \* \* \* \* \*

Strictly speaking, there is no obligation on the part of the Federal government, running to the plaintiffs, to make the "interest reduction payments." The government's obligation runs to the mortgagees. Since the mortgage terms and notes executed by the plaintiffs evidence that they assumed no personal liability for the payment of any money to the mortgagees in the event of default, it is clear that the mortgagees look to the guaranty of the Federal government for satisfaction if they are not paid. See *Trans-Bay Eng'rs & Builders, Inc. v. Lynn*, 396 F. Supp. 265, 268 (D.D.C. 1975). The upshot of the Federal regulatory scheme, as we see it, is to render persons in the position of the plaintiffs here as "outsiders"; incidental beneficiaries of an accommodation worked out by the lender and the provider of the operating subsidy. Thus, with regard to the "interest reduction payments," we do not conclude that the Federal government is satisfying or procuring a discharge of the plaintiffs' obligations in order to offset a debt running from the Federal government to the plaintiffs, nor can we say that the plaintiffs themselves have procured a cancellation or reduction of their indebtedness. [Fn. ref. omitted.]

The Supreme Judicial Court of Massachusetts was concerned with construing and applying the law of Massachusetts, including its statutes and precedents. Whether the court's holding is appropriate for the Massachusetts law is a matter with which we are not concerned; we are responsible for construing the provisions of the Internal Revenue Code in the light of the precedents established under that Code. Although the concepts of income under both the State and Federal laws may be similar, there may also be different precedents which may properly lead to different conclusions. See, for example, *Trustees of Amherst College v. Commissioner of Corps. & Taxation*, 354 Mass. 503, 238 N.E.2d 351, 353 (1968). In any event, and with due respect to the Massachusetts court, we have concluded that its holding is not proper under the Federal income tax laws.

As a practical matter, the mortgagee may, in the event of a default by the sponsor, look to HUD for reimbursement under the mortgage insurance, but we cannot agree that the sponsor has no obligation under the mortgage. It is evident from the face of the documents executed by the petitioner with respect to the project that he was the mortgagor of record. Initially, he was obligated to repay the principal and to make the interest and other payments called for by the mortgage, and he also was the grantor of the deed of trust which secured the apartment project as collateral for the mortgage. Moreover, we cannot agree that the sponsor does not benefit from the Government's payment of

a portion of the interest since he would have been required to pay such interest if it had not been paid by HUD. Actual physical receipt of the funds by the petitioner is immaterial; payment by HUD on his behalf is sufficient under Federal law to cause him to be taxable on such payments. See, e.g., *Old Colony Trust Co. v. Commissioner*, 279 U.S. 716 (1929).

The other cases the petitioner cites to support his contention that the interest reduction payments are not taxable income are also distinguishable. He cites *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837 (1975), for the proposition that a Government subsidy is not taxable income. The issue considered by the Supreme Court in that case was whether shares of stock entitling a purchaser to lease an apartment in a State-subsidized and supervised nonprofit housing cooperative are "securities" within the purview of the Securities Act of 1933 and the Securities Exchange Act of 1934. The Court of Appeals for the Second Circuit had held that such shares were securities and had stated that one of the factors in determining whether the shares were securities was the expectation of profit to be derived therefrom. The Court of Appeals stated that such expectation was based on the fact that the holder of such shares could secure housing at less than the market rate. *Forman v. Community Services, Inc.*, 500 F.2d 1246 (1974). However, in reversing the Court of Appeals, the Supreme Court stated that the expectation of a low rental could no more be considered a "profit" than any other Government subsidy program for the poor. In like manner, the tenants of a Section 236 project are the recipients of the public nontaxable subsidy, not the sponsor of the project. Therefore, *United Housing Foundation* lends no support to the petitioner's case.

The petitioner relies on *Commissioner v. First Security Bank of Utah*, 405 U.S. 394 (1972), to support his position that the interest reduction payments are not income to him because he was not entitled to receive them, but such reliance is misplaced. In *First Security Bank*, a holding company organized a subsidiary corporation (Life) to engage in the insurance business; another subsidiary corporation was a national bank (Bank). Bank originated credit life insurance, which was placed with an independent insurance company; but pursuant to a treaty of reinsurance, the independent company reinsured the business with Life. The Commissioner sought to allocate a portion of

Life's premium income to Bank as compensation for originating and processing the credit life insurance. However, court cases construing the relevant Federal banking law prohibited a national bank from acting as an insurance agent in most instances. The Supreme Court held that the assignment-of-income doctrine and section 482 could have no application where a taxpayer has no right, as a matter of law, to receive the income in question, which was the situation with Bank. The Court distinguished those cases where a taxpayer had constructive receipt of income or where a taxpayer actually received the income in violation of law. The case now before us is different from *First Security Bank* because, in the present case, to treat the interest reduction payments as income received by the petitioner is not violative of any public policy. Whether the petitioner received the payments by the Government in hand, or ever could have received them, does not change their inherent nature as a substitute for rent that otherwise would have been collected from the tenants. The petitioner benefited from the interest payment by HUD and is entitled to a corresponding interest deduction therefor.

Lastly, the petitioner's claim that the interest reduction payments are analogous to the nontaxable "incidental benefits" received by an employee in the course of business employment is without merit. In *United States v. Gotcher*, 401 F.2d 118 (5th Cir. 1968), the court held that a trip to Germany which Volkswagen of Germany and a dealer of the automobiles provided an employee of the dealer was not income to him. The court found that the trip was to induce the employee to purchase an interest in the dealership and reasoned that there was no economic gain to the employee which "is the key to section 61" (401 F.2d at 121), and that the value of the expense-paid items would not be income to the employee even though he received some incidental benefit if the primary purpose of such items was to benefit the employer. In the present case, the interest reduction payments were more than mere incidental benefits to the petitioner; they were very substantial benefits since he was relieved of paying the market-rate interest on the mortgage. His benefit was not insignificant and indirect, as he maintains.

Next, we must consider whether the doctrine of equitable estoppel should be applied in this case to prevent the Commissioner from asserting the deficiency claimed by him. The

petitioner contends that the Commissioner should be estopped from maintaining that the interest reduction payments are includable in his income since he had been "specifically and unequivocally" told by the officials of HUD that the payments would be deductible as interest without a corresponding inclusion in income. He maintains that he did not agree to undertake the Section 236 project until he had been "assured and reassured" that he would get favorable tax treatment. He further claims that his case is a more extreme case than other cases which have applied the doctrine of estoppel since he was not merely mislead by one agent or employee of the Government, but by an entire Federal agency, which was the agency charged with the administration of the Section 236 program.

Generally speaking, equitable estoppel precludes a party from denying his own acts or representations which induced another to act to his detriment. The doctrine of estoppel is based upon the grounds of public policy, fair dealing, good faith, and justice and is designed to aid the law in the administration of justice where without its aid injustice might result. The traditional elements of equitable estoppel include: (1) Conduct constituting a representation of material fact; (2) actual or imputed knowledge of such fact by the representor; (3) ignorance of the fact by the representee; (4) actual or imputed expectation by the representor that the representee will act in reliance upon the representation; (5) actual reliance thereon; and (6) detriment on the part of the representee. 28 Am. Jur. 2d 627 (1966); 3 J. Pomeroy, Equity Jurisprudence, sec. IX, p. 189 (1941); T. Lynn & M. Gerson, "Quasi-Estoppel and Abuse of Discretion as Applied Against the United States in Federal Tax Controversies," 19 Tax L. Rev. 487 (1964).

Although the doctrine of equitable estoppel is not inapplicable to the Federal Government, it has been applied to such Government with caution and only where justice and fair play require it. *Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380 (1947); *Goldstein v. United States*, 227 F.2d 1, 4 (8th Cir. 1955). It has also been recognized that the invoking of the doctrine of equitable estoppel against the Government "must be treated with the utmost caution, since its sanction in any case would result in having individual tax liability depend, not upon the factors and measures prescribed by Congress as applicable to all, but upon the statements and conduct of a particular Govern-

ment officer in respect of each individual." *Couzens v. Commissioner,* 11 B.T.A. 1040, 1148 (1928). Cases on equitable estoppel have made it clear that those dealing with an agent of the United States are held to have notice of the limitation of his authority, and the general rule is that the Government is neither bound nor estopped by the acts of its officers and agents in entering into an agreement or arrangement to do or cause to be done what the law does not permit or sanction. *Wilber Nat. Bank v. United States,* 294 U.S. 120, 123 (1935); *Utah Power & Light Co. v. United States,* 243 U.S. 389, 409 (1917); *Goldstein v. United States, supra* at 4; *Midwest Motor Express, Inc. v. Commissioner,* 27 T.C. 167 (1956), affd. 251 F.2d 405 (8th Cir. 1958), cert. denied 358 U.S. 875 (1958).

We have found that the representatives of HUD did in fact mislead the petitioner. It is highly regrettable that the officials of HUD undertook to represent what would be the tax treatment of the interest reduction payments when they were not the officials responsible for determining such tax consequences. Nevertheless, for a variety of reasons, we have concluded that such circumstances do not justify estopping the Commissioner of Internal Revenue from collecting the tax which is due under the law.

In the first place, the difference between mistakes of fact and mistakes of law is fundamental when dealing with the doctrine of equitable estoppel. See, e.g., *Ginsberg v. Commissioner,* 24 T.C. 273, 278 (1955). In *Schafer v. Helvering,* 83 F.2d 317, 320 (D.C. Cir. 1936), the Court of Appeals stated, in refusing to apply estoppel against the Commissioner: "Whoever deals with the government does so with notice that no agent can, by neglect or acquiescence, commit it to an erroneous interpretation of the law." Indeed, it is this rationale which lies behind the power of the Commissioner to correct mistakes of law in the application of the tax laws to particular transactions. It has been recognized that "He may do so even where a taxpayer may have relied to his detriment on the Commissioner's mistake. * * * This principle is no more than a reflection of the fact that Congress, not the Commissioner, prescribes the tax laws." *Dixon v. United States,* 381 U.S. 68, 73 (1965). In the case before us, the representations by the officials of HUD were clearly mistakes of law.

Moreover, although the erroneous statements reflected the policy of HUD, not merely the mistakes of a single employee, the

officials of HUD were, in making such statements, acting beyond their authority. In *United States v. Stewart*, 311 U.S. 60 (1940), the Supreme Court considered a somewhat analogous situation where estoppel was pled against the Commissioner because of representations made by another Federal agency. In that case, the Court held that the Farm Loan Board had no authority to make representations that capital gains realized on the sale of farm loan bonds were tax exempt. The Court stated at page 70:

There was no authority for the Board to make representations that capital gains were or were not tax exempt. That administrative function resided only in the Treasury. An officer or agency of the United States to whom no administrative authority has been delegated cannot estop the United States even by an affirmative undertaking to waive or surrender a public right. * * *

Although the officials of HUD were primarily responsible for misleading the petitioner, he was not wholly without fault. He may have thought that it was reasonable to rely upon the representations of those officials. However, he was a substantial businessman, and he was dealing with a very large investment. Nevertheless, he never sought the advice of an attorney or other expert in Federal tax matters, nor did he request an opinion from anyone at IRS. In view of the size of the investment and the experience of the petitioner, it is apparent that he should have sought more reliable counsel in the matter. Cf. *Ginsberg v. Commissioner*, 24 T.C. at 279. We recognize that an expert in tax matters may not have anticipated our conclusions as to the law regarding the taxability of the interest reduction payments, but we are confident that an expert would have advised him that there was substantial doubt as to the representations by the officials of HUD.

The petitioner relies most heavily on the case of *United States v. Lazy FC Ranch*, 481 F.2d 985 (9th Cir. 1973), to support his contention that the Commissioner should be estopped from determining that the interest reduction payments constitute income to him. In *Lazy FC Ranch*, the Ninth Circuit allowed estoppel to be invoked against the Government in an action by it to recover excess payments made to several partners under the soil bank program. The Federal Government, through the Agricultural Stabilization and Conservation Service (ASCS) of the Department of Agriculture, had helped to arrange and had approved a contractual agreement which enabled the partners to

qualify for the payments. It was this arrangement which the Government later contested. In applying estoppel against the Government, the court reasoned that the partnership would not have entered into the soil bank program if it had not been for the advice and assistance of an ASCS agent whose advice had been confirmed by the local authorities. The court stated that the United States had received the full benefits of the contract and that the partners lost at least as much profit from not farming as they received in Government payments. The court concluded that under such circumstances, the public policy of the United States would not be significantly frustrated by permitting the partners to retain the additional payments that were improper only because they exceeded the maximum payments under the regulations.

*Lazy FC Ranch* is distinguishable from the present situation on several grounds. In the first place, the court invoked the doctrine of equitable estoppel to prevent ASCS from correcting a mistake which it had made. Whereas, in the case before us, the petitioner asks us to estop the Commissioner of Internal Revenue because of misrepresentations made to him by HUD about the tax laws.

Even more significantly, we cannot conclude, as the Ninth Circuit concluded in *Lazy FC Ranch,* that the petitioner would suffer a "great injustice" (481 F.2d at 989) by our refusal to estop the Commissioner. Even though there were misrepresentations by the officials of HUD, petitioner has not shown that in fact he suffered any detriment as a result of his entering into such transaction. He may be unhappy at becoming involved in all the problems of operating such a project and at not securing all the tax advantages which he expected, but such unhappiness falls short of showing that he sustained a detriment. On this record, we cannot find that he suffered any great injustice. Moreover, although the petitioner is not entitled to exclude the interest reduction payments from his income and deduct such payments as if he had made them, he has received serveral other significant tax benefits as a result of his operation of the Section 236 project. For example, he was allowed 200-percent depreciation deductions on the project, and the commentators have generally considered such tax benefits to be much more significant inducements to the construction of Section 236 projects.

The other cases cited by the petitioner in support of his

estoppel argument are also distinguishable. In *United States v. Wharton*, 514 F.2d 406 (9th Cir. 1975), and *Fox v. Morton*, 505 F.2d 254 (9th Cir. 1974), the estoppel doctrine was applied against the agency which had *itself* misrepresented certain facts to the plaintiffs. In *Moser v. United States*, 341 U.S. 41 (1951), the Supreme Court expressly backed away from the estoppel argument and, instead, based its holding for Moser on the ground that he did not knowingly and intelligently waive his right to apply for American citizenship when he applied for an exemption from military service. Lastly, the Court of Appeals in *California Pacific Bank v. Small Business Admin.*, 557 F.2d 218 (9th Cir. 1977), considered the question of estoppel in the context of the enforceability of illegal contracts and refused to apply estoppel against the Small Business Administration in allowing it to collect under a guarantee arrangement it had made with a bank.

In the alternative, the petitioner argues that all the payments made by him during the years in issue were interest and, therefore, deductible under section 163. We must summarily dismiss this contention, for it is clearly contrary to the evidence presented in this case.

There were three elements to the mortgage payments made with respect to the petitioner's Section 236 project during the years in issue: a payment of principal, a payment of interest, and a payment for mortgage insurance. Under the Section 236 program, HUD paid the mortgage insurance premium and a portion of the interest. However, there can be no legitimate contention that HUD made any payments that were allocable to principal. Therefore, under no circumstances would all of the payments made by the petitioner be allocable to interest.

The last issue to be considered is the petitioner's contention that the minimum tax under section 56 is unconstitutional. He does not dispute the correctness of the Commissioner's computation of the minimum tax on items of accelerated depreciation and capital gains in his case; rather, he maintains that both these preference items represent valid deductions from gross income and that neither item represents income to him. Thus, he argues that the minimum tax is not a tax on income but is a direct tax which has not been apportioned in accordance with the Constitution. In the alternative, the petitioner claims that the minimum tax is a Federal excise tax which is deductible as

an ordinary and necessary business expense under section 162 or 212.

The constitutional basis of the congressional taxing power is found in article I, section 8, of the U.S. Constitution, which authorizes Congress to impose taxes, but direct taxes must be apportioned among the States according to population (art. I, sec. 2, cl. 3, and sec. 9, cl. 4). However, the 16th Amendment to the Constitution makes the apportionment requirement inapplicable to an income tax. It is a cardinal principle of statutory construction that if a revenue measure may be justified upon any constitutional grounds, it will be upheld. See *A. Magnano Co. v. Hamilton*, 292 U.S. 40 (1934); *United States v. Doremus*, 249 U.S. 86 (1919). In the early years of the income tax, there was a great deal of controversy over the meaning of the term "income" (see, e.g., *Eisner v. Macomber*, 252 U.S. 189 (1920)), but it is now clear that the concept of "income" for tax purposes is a broad one. In *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426 (1955), the Supreme Court declared that the income tax statute was designed to tax income to the full extent permitted by the Constitution and that "Congress applied no limitations as to the source of taxable receipts, nor restrictive labels as to their nature. And the Court has given a liberal construction to this broad phraseology in recognition of the intention of Congress to tax all gains except those specifically exempted." 348 U.S. at 429–430. It is recognized that income may include virtually any economic benefit received by the taxpayer.

In the case before us, the petitioner became subject to the minimum tax because he realized a gain on the sale of a capital asset, and because he sold other property with respect to which he had been allowed accelerated depreciation. In connection with both transactions, he realized gains which were properly the subject of an income tax. The tax on items of tax preference is merely a corollary to the other provisions imposing an income tax. When the minimum tax is applicable to taxpayers such as the petitioner, it in effect modifies or adjusts as to them the income tax which would otherwise be applicable. Although taxpayers generally are allowed a deduction with respect to long-term capital gains, that deduction is modified in the case of a taxpayer subject to the minimum tax. Similarly, although taxpayers are allowed deductions for accelerated depreciation in some situations, those deductions are readjusted for taxpayers

subject to the minimum tax. Thus, we conclude and hold that the minimum tax is a form of income tax and is not subject to the apportionment requirement of article I of the U.S. Constitution. Numerous other cases have implicitly or explicitly considered and rejected constitutional attacks on various grounds concerning section 56 and the minimum tax. See, e.g., *Lubus v. United States,* an unreported case (2d Cir., Jan. 5, 1978, 78–1 USTC par. 9242); *Parker v. Commissioner,* 74 T.C. 29 (1980); *Estate of Kearns v. Commissioner,* 73 T.C. 1223 (1980); *Buttke v. Commissioner,* 72 T.C. 677 (1979), affd. per curiam 625 F. 2d 202 (8th Cir., July 9, 1980); *Kolom v. Commissioner,* 71 T.C. 235, 250 (1978), on appeal (9th Cir., Jan. 26, 1979).

The petitioner also argues that the minimum tax is a violation of the equal protection clause of the 14th Amendment since the tax was intended to impose additional taxes on the wealthy. His argument is without merit. It has been held that the equal protection clause of the 14th Amendment is a restraint on actions of the States and places no restriction on Congress concerning a taxing statute. *LaBelle Iron Works v. United States,* 256 U.S. 377 (1921). Indeed, Congress enacted the minimum tax because it found that there was an unfair distribution of tax burden resulting from abuses by individuals who escaped taxation on certain portions of their income because of provisions in the tax laws. S. Rept. 91–552 (1969), 1969–3 C.B. 423, 495–499. It has long been recognized that Congress may impose progressively higher rates of tax on taxpayers with larger incomes. *Brushaber v. Union Pacific Railroad Co.,* 240 U.S. 1 (1916). The Second Circuit recently acknowledged and condoned the congressional purpose underlying the minimum tax on tax preferences and stated that the provision "was not to give tax relief, but rather to impose an additional tax upon high income individuals with large amounts of nonwage income." *Lubus v. United States, supra,* 78–1 USTC par. 9242 at 83,444.

Since we have concluded that the minimum tax is an income tax, we do not reach the petitioner's alternative claim that such tax is an excise tax deductible under section 162 or 212.

Due to concessions by the parties,[6]

*Decision will be entered under Rule 155.*

---

[6]By a second amendment to his answer, the Commissioner made clear that he was not claiming any deficiency in excess of that set forth in the notice of deficiency, and in any event, we are not sustaining any claim for an excess deficiency. *Koufman v. Commissioner,* 69 T.C. 473 (1977).