ESTATE OF GENE TUNNEY, Deceased, NELSON BUHLER, MARY LAUDER TUNNEY and BANKERS TRUST COMPANY OF NEW YORK, Executors, and MARY LAUDER TUNNEY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Tunney v. Commissioner
Docket Nos. 3888-77, 11521-77
United States Tax Court
T.C. Memo 1981-614; 1981 Tax Ct. Memo LEXIS 132; 42 T.C.M. (CCH) 1500; T.C.M. (RIA) 81614; October 20, 1981. Nelson Buhler and Albert Dib, for the petitioners. Kevin C. Reilly and Jay S. Hamelburg, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: Respondent has determined the following deficiencies in petitioners' Federal income tax: Taxable Period
Deficiency
1972
* $ 13,665.81
1973
39,149.00
1974 ** 21,484.32
*132 This case resents the following issues for our decision: (1) Whether petitioners are entitled to a medical expense deduction under section 213(a); [1]
(2) Whether petitoners have adequately established the basis of stock for purposes of computing the amount of gain upon its sale; and (3) Whether amounts paid for the rental of a room qualify as a trade or business expense under section 162(a). FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and the attached exhibits are incorporated herein by this reference. Gene Tunney (Gene) and Mary Lauder Tunney (Mary) filed their joint 1972 Federal *133 income tax return at the Andover Service Center, Andover, Massachusetts. They filed their 1973 and 1974 joint Federal income tax returns at the Brookhaven Service Center, Holtsville, New York. At the time of the filing of the petitions in these cases, Gene and Mary resided in Stamford, Connecticut. Gene died during the pendency of these actions and his estate is represented here by his executors: Nelson Buhler, Mary Lauder Tunney, and Bankers Trust Company of New York (Bankers). The Tunneys had 4 children: Gene L. Tunney (Gene L.), John Varick Tunney (John), Jonathan Rowland Tunney (Jonathan), and Joan Tunney Wilkinson (Joan). Some time prior to April of 1970, Joan, approximately 31 years of age at the time, became ill and required extended hospitalization. Her brother, Gene L., applied for and was appointed conservator of the estate of Joan Wilkinson by the Superior Court of the state of California (Marin County) on June 18, 1970. In his petition for appointment dated April 9, 1970, Gene L. described his sister's assets and income as follows: Cash
$ 700
Securities
30,000
Other personal property
1,000
Total estimated value of all
personal property
$ 31,700
Estimated annual income from
real property
$ 15,600
Estimated annual income from
all property
$ 16,800
*134 Gene L's bond was set at $ 48,500 based upon this information. In order to raise money for his ward's continuing care, Gene L. was forced to sell certain real property belonging to the conservatee. The sale was made on January 15, 1971, for $ 236,522. Payment was made as follows: purchasers assumed an existing first mortgage on the property of approximately $ 169,000, cash of $ 29,522 was given by the purchasers to pay off an existing second loan of approximately $ 29,689.92, and the balance of $ 40,000 was received by the sellers in the form of a promissory note from the purchasers bearing interest at 10 percent per annum, payable monthly, with the principal sum due 5 years from the date of the note. The note was secured by a second deed of trust on the property. On March 5, 1971, Gene L. filed a petition with the Superior Court for authority to expend money for the support and maintenance of the conservatee. This petition estimated the value of the conservatorship and its annual income as follows: Cash
$ 60,757.49
Securities
25,481.38
Promissory note
40,000.00
Other personal property
500.00
$ 126,738.87
Estimated annual income
$ 7,200
The *135 court approved the conservator's petition and authorized him to expend up to $ 50,000 during the 12-month period commencing March 1, 1971, for the support and maintenance of the conservatee at the hospital. As a conservator, Gene L. paid Joan's medical expenses during 1970 and 1971 out of her estate. However, by early 1972 it became obvious to Gene L. that in spite of the sale of the realty, the conservatorship estate would soon be depleted. This knowledge led to discussions between Gene L. and Mary as to who would assume these expenses once the estate became insolvent. They decided that Mary would have to start paying the expenses at some point in time, but she did not reveal to Gene L. where she planned to obtain the funds. Gene L. filed a first accounting and report of conservator on January 12, 1973. The accounting includes a listing of all moneys received and disbursed from June 18, 1970 through October 31, 1972. Assets on hand at the close of the accounting period (October 31, 1972) were determined to be $ 46,014.27. The $ 46,014.27 was represented by the $ 40,000 promissory note received from the realty sale, two small bank accounts, and two uncashed interest checks. *136 On January 12, 1973, the conservator sold the promissory note at a discount for $ 36,000 less commissions of $ 2,160 for net proceeds of $ 33,840. No principal payment had been made as of that date. A second account and report of conservator was filed on January 12, 1976, covering the period October 31, 1972 to September 5, 1975. The assets of the conservatorship estate on hand at the end of the period consisted entirely of cash in three bank accounts in the amount of $ 33,379.23 computed as follows: Assets on hand at close of prior
account period
$ 46,014.27
Income receipts during the account
period (e.g. interest)
* + 1,769.26
Uncashed check (misplaced by payee)
+ 1,950.00
Available assets
$ 49,733.53
Cash disbursements during the account
period
-12,354.30
Loss on sale
- 4,000.00
Total
$ 33,379.23
A third and final report was filed September 12, 1978 for the period September 5, 1975 to August 31, 1978. It recited that Joan no longer required hospitalization and was now able to care for herself and her property. As a consequence, there was no longer *137 a need for the conservatorship. Assets on hand at the end of this account period consisted entirely of cash in the sum of $ 3,484.67: Assets on hand at close of prior
account period
$ 33,379.23
Income receipts (interest)
+ 936.47
Available assets
$ 34,315.20
Cash disbursements during the
account period
-30,831.03
$ 3,484.57
The conservatorship was ordered terminated, and after payment of all fees and expenses (including $ 1,250 for attorney's fees), the remaining cash was to be distributed to Joan. In terms of disbursements, the conservatorship accountings show that the conservator actually paid the following amounts for the support and care of Joan: 1972
Doctor's bills
$ 6,300.00
Attorney's fees
2,755.52
Transportation for conservatee's
1,050.50
Children to visit
$ 10,106.02
1973
Doctor's bills
$ 1,949.00
Lodging for conservatee
40.00
Commission on sale of promissory note
2,160.00
Attorney's fees
2,103.96
Dental care for children of conservatee
455.00
Federal income taxes
387.67
$ 7,095.63
1974
Hospitalization expenses
$ 559.29
Transportation for conservatee's children
to visit
501.30
$ 1060.59
*138 In addition to the above amounts, the first accounting reveals payments for Joan's hospitalization and incidental expenses, but fails to specify the day and year of payment. These are shown as follows: Hospital treatment and care, 2-16-71 to
9-15-72
$ 82,888.76
Hospital, incidentals account, 2-16-71
to 6-18-72
537.87
On March 5, 1971, Gene L. Tunney as conservator of the estate of Joan T. Wilkerson executed a financial agreement with the hospital whereby the estate agreed to pay "all charges incurred for the care and treatment of the * * * patient," "all personal expenses," and "additional charges for surgical, dental and other professional services which require a specialist." Statements for medical expenses were to be resented semimonthly, and were payable when rendered. Billings for personal expenses were to be presented monthly and were to be handled separately from the regular hospital bill. This agreement was in effect without any change in its terms throughout the entire time Joan was hospitalized at this particular institution, which was until 1975 when she was transferred to another facility. As explained earlier, knowing that Joan's estate was *139 rapidly becoming depleted, her mother embarked upon a course of action designed to provide the necessary funds so that her daughter's treatment would not be interrupted. To this end she consulted with her attorney, Mr. Nelson Buhler, who in turn contacted Mr. Joseph F. Lord, a senior vice president at Morgan Guaranty Trust Company of New York. Through this consultation a plan was devised to effectuate Mary's intentions to provide her daughter's estate with a source of funds. The actual operation of the contemplated arrangement was quite complex. Bills and other notices requiring payment were sent directly to Mr. Buhler's law office. Mr. Buhler then sent a copy of the bill to Mr. Lord at Morgan, who tranged for Morgan to issue checks to the payee. The checks were then forwarded to Mr. Buhler's office, where he would forward the check, together with the bill, to the payee. To put the plan into effect, Mary apparently decided to borrow the needed funds. On May 19, 1913, George Lauder (Mary's father) had created a trust. As of February 6, 1972 the corpus of the trust was comprised of various stocks and bonds valued at $ 6,053,725. During 1972, Mary was the income beneficiary *140 and the remaindermen were her issue (Gene L., Jonathan, John, and Joan). On February 22, 1972, Mary executed a demand note for $ 80,000, without interest, in favor of Thatcher M. Brown, Jr., and Morgan Guaranty Trust Company of New York, as trustees under the trust referred to above. As part of the same document, each of her 3 sons (Gene L., Jonathan, and John) signed an agreement to guarantee to the trustees prompt repayment of the note. As security, each assigned to the trustees their entire contingent remainder interest in the trust. By a separate demand note, also dated February 22, 1972, Gene L. Tunney, "as committee of the property of Joan Tunney Wilkinson," promised to pay to Mary Lauder Tunney $ 80,000, without interest. As of the time of trial, Mary had not yet repaid the $ 80,000 to the trust. On March 30, 1972, a letter was sent to Mary by Morgan Guaranty advising her that the loan proceeds had been paid over to her. The letter stated in relevant portion: Re: Mary L. Tunney Junior Trust - PV 4738
We have today transferred $ 80,000 to your Fifth Avenue checking account representing the proceeds of a loan from the Junior trust pursuant to your note dated February 22, 1972. *141 Mary's share of income from the trust also would normally be deposited to the same checking account. Therefore her income from the trust and the loan proceeds were commingled in her checking account.A monthly statement from Mary's checking account with Morgan Guaranty (in the name of "Mrs. Mary Lauder Tunney Mrs. Gene Tunney") reveals a credit on March 30, 1972, in the amount of $ 80,000. On April 14, 1972, the same account shows a debit memo for $ 80,000. On April 14, 1972, Mary opened a savings account (in the name of "Mrs. Mary Lauder Tunney") at the Fifth Avenue Office of Morgan Guaranty. The initial deposit into the account was made on that same day in the amount of $ 80,000. On the books "New Account Report," under "description of original deposit," the notation was entered "80,000 transferred from checking." Mr. Buhler wrote to Mr. Lord of Morgan Guaranty of November 20, 1972. Attached to the letter was a handwritten note signed by Mary authorizing the bank to carry out Mr. Buhler's instructions with respect to disbursement of the sums in Mary's savings account: Nov. 15, 1972 Morgan Guaranty Trust Co. of N.Y., 44th St. and 5th Ave., N.Y.N.Y., 10017 Re: Mary *142 L. Tunney, Savings Account Att: Joseph Lord Gentlemen:-- This will authorize you to carry out the written instructions of my attorney, Nelson Buhler, Esq., as to the disbursement of the sums in the above account, - (which funds are the property of my daughter, Joan Tunney Wilkinson). Thank you. -- /s/ Mary Lauder Tunney, Mary Lauder Tunney Mr. Buhler's letter also advised Mr. Lord that Mrs. Tunney desired checks to be drawn in order to pay $ 10,380.31 to the hospital for Joan's hospital bill through October 22, 1972 and to pay $ 650 for the doctor's services for October of 1972. On November 28, 1972, a checking account (No. XXX XX 004) was opened at the Fifth Avenue branch of Morgan Guaranty. The account was titled "Mary Lauder Tunney--J.T.W., Special Account." The address given was that of Mr. Buhler, with duplicate statements to be sent to Mary. The "New Account Report" contained, insofar as is relevant herein, the following information: CROSS REFERENCES: Fifth Avenue Checking and Saving Accounts: "Mrs. Mary Lauder Tunney". REMARKS AND SPECIAL INSTRUCTIONS: This account is open to pay for medical expenses of Joan Tunney Wilkinson and most of the time will *143 be carried with a zero balance. No checkbooks will be issued and the only instructions will come from NELSON BUHLER or from MRS. TUNNEY herself and will be in letter form. DESCRIPTION OF ORIGINAL DEPOSIT: $ 11,031.31 transferred from the Savings Accont of Mrs. Mary Lauder Tunney. This $ 11,031.31 is within 1 dollar of the amount of the two checks requested in Mr. Buhler's letter of November 20, 1972, to Mr. Lord to pay the hospital and doctors. On December 1, 1972, savings account No. XXX XX 004was opened at the Fifth Avenue branch of Morgan Guaranty. The account was titled "Mary Lauder Tunney - J.T.W. Special Account." The address given was that of Mr. Buhler, with duplicate statement to be sent to Mary. The "New Report Account" contained, insofar as is relevant herein, the following information: CROSS REFERENCES: 5TH Avenue checking account "Mary Lauder Tunney-J.T.W. SPECIAL ACCOUNT".
5TH Avenue checking account "Mrs. Mary Lauder Tunney". 5th Avenue checking account "Mrs. Mary Lauder Tunney" (To close). REMARKS AND SPECIAL INSTRUCTIONS: SUMMARY STATEMENT: NOTE: The Savings Account of Mrs. Mary Lauder Tunney" (123 41 960) should be closed and the balance *144 transferred from that account in order to open this new account. DESCRIPTION OF ORIGINAL DEPOSIT: $ 70,649.50 transferred from Savings Account - Mrs. Mary Lauder Tunney. Although the necessary checking and savings account statements were not made available to us in order that we might confirm the order of transition between accounts, [2] it appears quite clear from the bank's other records that the $ 81,680.81 transferred from Mary's savings account into the special accounts represents the $ 80,000 borrowed by Mary from the trust, along with interest which had been earned on that amount. It is also evident from these documents that the design was to hold the funds in the savings portion of the account, where they would earn interest, and simply transfer as much into the checking portion as required to cover checks which had been drawn against the account. Additionally, it was the bank's position that under Federal Reserve regulations the bank could not charge a savings account and make payments to a third party.All transactions were to require written authorization from either Mr. Buhler or Mary Tunney. *145 In accordance with the practice of Morgan Guaranty, the social security number on an account is either (1) the owner of the account or (2) the person who is to report the interest. The depositor chooses whose number to give. Morgan Guaranty attempted to obtain Joan's social security number, but never was. successful. The three accountings filed by Gene L. on behalf of Joan's estate show no interest income from any accounts with Morgan Guaranty. Petitioners reported interest income from Morgan Guaranty of $ 2,149 in 1973 and $ 1,592 in 1974. [3] The interest credited to savings account No. XXX XX 004 during 1973 was at least $ 1,611.94 and was $ 1,493.15 for 1974. Petitioner was supplied copies of Morgan Guaranty treasurer's checks which correspond to many of the withdrawals from the special checking account in both date and amount. The following chart summarizes the transactions in this account: 1972
Total checking account debits
$ 16,026.21
Payee: Hospitals
10,380.31
Doctors
651.00
Purpose unknown
4,994.90
*146 1973
Total checking account debits
$ 38,358.24
Payee: Hospital
$ 27,231.59
Doctors
2,120.00
Purpose unknown
9,006.65
1974
Total checking account debits
$ 13,353.62
Payee: Hospital
$ 9,638.79
Doctors and dentist
2,392.32
Purpose unknown
1,322.51
An additional $ 10,000 was deposited into the special savings account on December 31, 1974, from an unidentified source, but had not been withdrawn as of the end of 1974.
According to the assistant comptroller of the hospital, their records show payments in the following amounts against the medical expense of Joan T. Wilkinson: 1971
$ 44,916.02
1972
48,353.05
1973
40,014.49
1974
559.29
The hospital's ledgers reflect only the amount of credits applied to the bill and do not show the source of the credits. Joan Tunney Wilkinson is Mary Lauder Tunney's daughter and an American citizen. Insofar as the information available reveals, no one other than the conservatorship or possibly Joan's mother contributed to her support from 1972 through 1974. She received no gifts, inheritances, or distributions from the trust during those years. Petitioners made *147 no claim on their joint 1972 Federal income tax return for any of Joan's medical expenses. The notice of deficiency, however, included a determination by the Respondent that petitioners were entitled to a net increase in medical deductions for 1972 of $ 8,790.97, this amount resulting from the allowance by respondent of $ 15,825.21 in expenses paid for the medical treatment of Joan. Respondent later changed his mind about the propriety of petitioners' claim and by means of an amended answer disallowed in full the claimed deduction for Joan's medical expenses. On their 1973 Federal income tax return, petitioners claimed $ 36,287.74 for medical expenses of Joan. Respondent disallowed the entire deduction in his deficiency notice. As for 1974, petitioners claimed $ 16,402.36 for Joan's medical expenses. No portion of this amount was disallowed in the notice of deficiency. Respondent filed an amended answer, however, disallowing the deduction and increasing taxable income by $ 16,402.36. [4]
*148 On July 3, 1973, the Tunney Family Trust #2 sold 3,000 shares of Gimbel Brothers, Inc., common stock for $ 67,543.63. On July 5, 1973, the trust sold another 70 shares for $ 1,549.62. On their 1973 Federal income tax return, petitioners claimed a basis in the 3,000 shares and the 70 shares of $ 6,375 and $ 148.75, resulting in long-term capital gains of $ 61,168.63 and $ 1,400.87, respectively. The 3,070 shares in question were purchased at some unknown time from the brokerage firm of Montgomery Scott (now Janney Montgomery Scott, Inc.). On or about January 28, 1970, the shares were delivered to Bankers Trust Company as co-trustee of the Tunney Family Trust #2. The trust later sold the shares. The only evidence offered as to the basis of these shares is a schedule of securities prepared by Montgomery Scott for Gene Tunney. It shows 250 shares of Gimbel Brothers stock followed by the notation "(2.125/share)", with a cost balance as of December 31, 1970 of $ 531.25. Since petitioners reported a net capital loss for 1973, the respondent disallowed part of petitioners' capital loss carryforward from 1973 to 1974, thus resulting in an increase to 1974 taxable income of $ *149 3,262. This represents one-half of the sum of the claimed bases, the stock having been held long-term. Gene and Mary spent a large portion of the summer months on an island where there was no telephone. Mr. Tunney was a director of a number of corporations. He rented a small room equipped with a telephone on shore from one Christine Jones. Petitioners introduced two checks dated November 1, 1972 and November 1, 1973, both made payable in the sum of $ 600 to Christine Jones and both signed by Gene Tunney, which they contend represents payments on annual leases of the room, Christine Jones not wishing to rent it out merely for the summer months. Petitioners claimed deductions of $ 600 in both 1972 and 1973 on account of these rental payments. In his notice of deficiency, respondent disallowed these deductions. OPINION Joan Tunney Wilkinson, daughter of Mary Lauder and Gene Tunney, was hospitalized and in need of constant medical attention during the period from 1971 through 1976. Her condition necessitated the appointment of a conservator to manage her affairs. By the middle of 1972, the conservator had exhausted nearly all of Joan's readily available assets in paying *150 for her care. A plan was devised to insure continued payment of these expenses. Mary was the life beneficiary of a very substantial trust, and its remaindermen were her four children (including Joan). Mary borrowed $ 80,000 from the trust by means of an interestfree demand note. Contemporaneously with Mary's borrowing, her three sons executed a document pleading their entire remainder interests to guarantee repayment of the $ 80,000 their mother had borrowed. Additionally, the conservator of Joan's estate executed an interest-free demand note in the same amount, $ 80,000, in favor of Mary. The $ 80,000 was first deposited into Mary's checking account, then transferred to her savings, and then finally was transferred into a new account which she created and titled "Mary Lauder Tunney--J.T.W. Special Account." This latter account included both checking and savings. Joan's medical bills were paid from this account from late 1972 through at least the end of 1974. Petitioners claimed medical expense deductions for amounts paid from the bank accounts to Joan's hospitals and doctors. They claim that Joan was their dependent since they provided over one-half of Joan's support; *151 and that they are thus entitled to a medical expense deduction as a result of Mary's payments. Conversely, respondent urges that Joan was not their dependent during the years 1972-1974; and that in any event the payments were made with Joan's own money and the purported loans to Mary by the trust should be disregarded as without economic substance. As respects the taxable year 1973, the burden of establishing entitlement to the claimed deduction rests upon the petitioners. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. As to the years 1972 and 1974, however, respondent concedes that the burden of proof on the medical expense issue falls on his side since he first raised the issue by way of an amended answer. Graff v. Commissioner, 74 T.C. 743, 748 n. 2 (1980); Tauber v. Commissioner, 24 T.C. 179 (1955); Rule 142(a), Tax Court Rules of Practice and Procedure.
Generally, section 213(a) [5] allows a deduction for the amount of expenses in excess of 3 percent of adjusted gross income paid during the taxable year for the medical care of the taxpayer, his spouse, and dependents (as *152 defined in section 152) and not compensated for by insurance or otherwise. It is undisputed that substantial sums were paid from the bank account in question for the "medical care" of Joan Tunney Wilkinson. [6] The principal question to be resolved is whose funds were used--Joan's or her mother's. We hold that all funds expended from this account during the years here in issue were the property of Joan Tunney Wilkinson, and therefore no deduction is allowable to petitioners on account of these payments. *153 On February 22, 1972, Mary purported to borrow $ 80,000 from a trust of which she was the income beneficiary. The "loan" was guaranteed by three of the remaindermen through a pledge of their interests worth many times the face of the note. Although respondent asserts that because of this guarantee Mary was never at economic risk, we refuse to base our decision on this fact. What is true is that the trust was virtually assured of repayment through this device and thus bore little if any risk; however, this does not alter the fact that Mary remained primarily obligated on the note. She thus still shouldered the responsibility for returning the $ 80,000 upon demand so long as she remained financially solvent. What is fatal to the petitioners' cause is the separate note, also of February 22, 1972, signed by Gene Lauder Tunney "as committee of the property of Joan Tunney Wilkinson," promising to pay Mary $ 80,000 upon demand. By signing this note, Gene L. borrowed from Mary on behalf of his ward, the $ 80,000 *154 which Mary had just borrowed from the trust. Our conclusion is made clearer by an analysis of the actual events subsequent to the signing of the notes. The $ 80,000 was placed into Mary's checking account--the delivery to her of the money which she had borrowed. Mary then placed her money into savings account to earn interest. When Joan's estate was almost depleted, Mary decided it was time to act. She opened the "special" accounts, transferred the $ 80,000 to them, and instructed her bank and her attorney to begin paying Joan's medical bills out of the money. It was at this point that Mary conveyed to Joan's estate the $ 80,000 which it had borrowed by the February 22, 1972 demand note. [7]
Our conclusion is based on several factors. First, were this not the case, Joan's estate would have given its unconditional obligation to pay $ 80,000 to Mary upon demand, yet would never *155 have received the $ 80,000 it had borrowed. Second, the account title contained more than just Mary's own name--it also bore Joan's initials along with the notation "special account." Finally, that Mary herself considered the money in the special account to be her daughter's is graphically displayed in her letter of November 15, 1972 to Morgan Guaranty where, in referring to the money in the "special" bank accounts, she said "which funds are the property of my daughter, Joan Tunney Wilkinson." Petitioners claim the demand note given by Gene L. is of no consequence. They argue that since Joan's own funds were exhausted and Joan had no income the note was valueless when made. It is difficult to understand why one would wish to present another with a worthless piece of paper, but we need not be perplexed by this question since the note did indeed have sufficient financial underpinnings. While not covering the full $ 80,000, the reports of the conservator show assets of $ 46,014.27 on October 31, 1972 (a little more than 8 months after the making of the note), $ 33,379.23 on September 5, 1975, and even as late as August 31, 1978 there was still $ 3,484.67 remaining. Although small *156 in amount, the conservatorship did continue to earn income throughout this period. Additionally, the conservator's final report reveals that as of the end of 1977, Joan had fully recovered, remarried, and was self-supporting. She was employed briefly from the fall of 1976 to the early summer of 1977, although she has not worked since her marriage. We can perceive no reason that Mary could not now look directly to her daughter for repayment. [8]
Moreover, petitioners have chosen to ignore the potentially valuable contingent remainder interest which Joan possessed. Petitioners presented no evidence regarding the nature of the contingency. It may be that survivorship and a lack of prior depletion were the prerequisites.No evidence was given at trial to indicate that Joan's condition, even though serious, was life threatening or that she would not be able to reach her life expectancy. We do not believe that a one-fourth contingent remainder interest in the *157 corpus of a trust valued at over $ 6,000,000 can be ignored in the context of this case. From the foregoing it is obvious that the note was not valueless at the time it was issued nor at the time of trial. But even if it had been, or was worth something less than face, the note would still have been valid. The situation where a debtor does not have assets sufficient to cover the borrowed principal is not an unusual one--indeed, if he had the money he may not have needed to borrow it. Rather, some creditors look to other factors beyond mere economic wealth--to intangibles such as earning power and reputation. Other creditors simply make bad loans. And at other times it is hard to be objective in assessing the potential for repayment, particularly where the borrower is one's own daughter. Petitioners also argue that the statute specifically contemplates a situation in which the taxpayer incurs an expense in one taxable year and is reimbursed by insurance proceeds "or otherwise" in a subsequent taxable year. Therefore, petitioners reason, the medical expenses paid, although subject to reimbursement, are currently deductible and any future payment on the demand note would be *158 reported as income when received. The simple answer to this contention, without repeating our earlier discussion characterizing the payments a loan disbursements which are not deductible, is that the language "or otherwise" found in section 213(a) generally refers to reimbursements in the nature of insurance. A loan, at least in the context of the facts before us, is not in the nature of insurance. Gene Tunney held an unknown quantity of Gimbel Brothers, Inc., common stock with the brokerage firm of Montgomery Scott. On or about January 28, 1970, he transferred 3,070 shares to Bankers Trust Company, who later sold those shares. Petitioners bear the burden of establishing the appropriate basis to be used for determining the amount of gain or loss on the sale, Rule 142(a), Tax Court Rules of Practice and Procedure, even though the necessary records may long since have been destroyed making proof of this fact virtually impossible. Interlochen Co. v. Commissioner, 232 F.2d 873, 878-879 (4th Cir. 1956), affg. 24 T.C. 1000 (1955). The sole evidence proferred by the petitioners to prove the basis of these shares was a stock summary as of the end *159 of 1970 prepared by Montgomery Scott. From this we can determine only the basis for the 250 remaining shares. We have no way to know for certain whether the $ 2.125 per share cost also applies to the 3,070 shares, or any part of them, since no evidence was offered to show that the 250 shares were purchased at the same time and at the same price. Nor were we informed of the approximate date of purchase so that an estimate could be made.No confirmation slip, bank withdrawal or other record was presented; in fact, nothing was made available to show even that the stock was purchased by Mr. Tunney rather than received as a gift or inheritance. Since the cost of the 250 shares does not necessarily reflect the cost of the stock in question, we must sustain respondent's determination on this issue. Finally, petitioners contend that when Gene and Mary spent their summers on an island with no communication lines, Gene was forced to pay $ 600 per year to rent a small room on mainland so that he could stay in telephone contact with the several corporations on whose boards of directors he served. This claim is based primarily upon two checks for $ 600 each and the testimony of petitioners' *160 attorney that the recalls Gene Tunney relating this arrangement to him in order to enable the attorney to prepare the Tunneys' 1972 and 1973 income tax returns. We find the entire story highly implausible. In the first place, no showing was made to demonstrate the need to rent an entire room in order to use a telephone. Furthermore, it is entirely possible that the Tenneys also slept in this room when visiting the mainland, which of course is a nondeductible personal expenditure.The mere fact that the room may have contained a telephone the incidental use of which served a business purpose cannot justify the deduction of the rent paid for the premises. No records were furnished showing the installation of a telephone and its use for business purposes. Accordingly, we cannot allow petitioners any of the deductions which they have sought. Decisions will be entered under Rule 155. Footnotes
*. The statutory notice sent to petitioners for 1972 proposed a deficiency of $ 4,409.89. By way of an amended answer, respondent proposed a $ 9,255.92 increase in the deficiency to the present amount. ** The statutory notice for 1974 proposed a deficiency of $ 1,766. By way of an amended answer, respondent increased the proposed deficiency by $ 9,718.32 to the present amount.↩
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years here in issue.↩
*. Includes interest income of $ 91.29 actually accrued during the prior account period.↩
2. Pursuant to a subpoena, Mrs. Helen Lovell, a vice president of Morgan Guaranty, brought to trial bank statements on the abovementioned accounts covering the years 1972-1974. These statements were identified and received into evidence without objection. Unfortunately, several critical statements were not furnished including: (1) Statements concerning savings account XXX XX 960 subsequent to June 30, 1972 (thus failing to show the alleged transfer of the $ 80,000 into the special accounts), (1) Statements concerning savings account XXX XX 960 subsequent to June 30, 1972 (thus failing to show the alleged transfer of the $ 80,000 into the special accounts), (2) The statement for savings account XXX X2 004 covering the period September 29, 1973, and (2) The statement for savings account XXX X2 004 covering the period September 29, 1973, and (3) The statement for checking account XXX XX 004 covering October 1974.(3) The statement for checking account XXX XX 004 covering October 1974.↩
3. Since savings account No. XXX XX 004 was not opened until December 1, 1972, no interest would have been credited during 1972. The first interest payment actually took place on January 2, 1974.Since savings account No. XXX XX 004 was not opened until December 1, 1972, no interest would have been credited during 1972. The first interest payment actually took place on January 2, 1974.↩
4. Proof of payment was not presented for the total deductions claimed for each year. For 1972, petitioners claimed $ 15,825.71 and yet only presented checks totalling $ 11,031.31. For 1973, the claim was $ 36,287.74 and the checks totalled $ 29,351.59. It was the same story in 1974, with claims for $ 16,402.36 and checks to doctors and hospitals aggregating only $ 12,031.11.↩
5. Sec. 213(a) provides: SEC. 213. MEDICAL, DENTAL, ETC., EXPENSES. (a) ALLOWANCE OF DEDUCTION.--There shall be allowed as a deduction the following amounts, not compensated for by insurance of otherwise-- (1) the amount by which the amount of the expenses paid during the taxable year (reduced by any amount deductible under paragraph (2)) for medical care of the taxpayer, his spouse, and dependents (as defined in section 152) exceeds 3 percent of the adjusted gross income, and (2) an amount (not in excess of $ 150) equal to one-half of the expenses paid during the taxable year for insurance which constitutes medical care for the taxpayer, his spouse, and dependents.↩
6. In the context of the present case, "'medical care' means amounts paid for the diagnosis, cure, mitigation, treatment or prevention of disease." Sec. 213(e)(1)(A).↩
7. It matters none whether we view the transfer into the "special accounts" as a lump-sum delivery of the loan, or whether each payment of a medical bill constituted a partial disbursement of the proceeds. In either event, it was money belonging to Joan's estate which paid her medical expenses.↩
8. When a conservatorship is terminated, whatever rights existed a gainst the estate continue against the conservatee. See, Omansky v. Stewart, 276 Cal. App. 2d 211, 80 Cal. Rptr. 738, 740↩ (Ct. App. 1969).