T.C. Memo. 2020-129

UNITED STATES TAX COURT

THE KOREAN-AMERICAN SENIOR MUTUAL ASSOCIATION, INC.,
Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 21829-17X.                    Filed September 9, 2020.

Samuel S. Weissman, for petitioner.

Catherine R. Chastanet and Mark L. Hulse, for respondent.

MEMORANDUM OPINION

LEYDEN, Special Trial Judge:  After examining the activities of petitioner,

The Korean-American Senior Mutual Association, Inc. (KASMA), the Internal

[*2] Revenue Service (IRS)[1] issued a final adverse determination letter dated

September 6, 2017, revoking KASMA's tax-exempt status as of that date. The

IRS determined that KASMA was not operated exclusively for one or more

exempt purposes as set forth in section 501(c)(3).[2] KASMA exhausted its

administrative remedies, see sec. 7428(b)(2); Rule 210(c)(4), and challenged the

IRS' determination by timely filing a petition with the Court for a declaratory

judgment, see sec. 7428(a), (b)(3). The sole issue for determination is whether

KASMA was operated exclusively for one or more exempt purposes as set forth in

section 501(c)(3). The Court concludes it was not.

## Background

The parties filed with the Court the entire administrative record and

submitted this case for decision without trial in accordance with Rule 217(b)(1)

and (2). See also Rule 122. For purposes of this proceeding, the facts and

---

[1]The Court uses the term "IRS" to refer to administrative actions taken outside of these proceedings. The Court uses the term "respondent" to refer to the Commissioner of Internal Revenue, who is the head of the IRS and is respondent in this case, and to refer to actions taken in connection with this case.

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended, in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.

**[*3]** representations contained in the administrative record are accepted as true,

see Rule 217(b)(1), and are incorporated herein by this reference.[3]

KASMA is a New York nonprofit organization with its principal place of

business in New York, New York, when its petition was filed with the Court.

I.      KASMA's Organization

KASMA was organized as a nonprofit corporation under the laws of New

York on May 28, 1996.  According to KASMA's certificate of incorporation,

signed on May 22, 1996, and amended on May 18, 1998, KASMA "is organized

exclusively for charitable and educational purposes, as specified in Section

501(c)(3) of the Internal Revenue Code of 1986" and formed for the following

four purposes:

> a) To provide burial benefits and assistance to the surviving families
> of deceased;
>
> b) To provide information to senior citizens in regard to their burial
> concerns and general welfare;

---

[3]Respondent in his opening brief states that the IRS revoked KASMA's tax-exempt status because it was neither organized nor operated exclusively for one or more exempt purposes.  However, the final adverse determination letter states the reason for revoking KASMA's tax-exempt status is that KASMA was not operated exclusively for one or more exempt purposes as set forth in sec. 501(c)(3). Therefore, the Court does not address respondent's argument that KASMA was not organized exclusively for one or more exempt purposes.

[*4]   c) To provide organized activities for senior citizens to enhance their effective use of free time and friendship; and

d) To provide annual scholarships to needy, promising students.

II.   KASMA's Application for Recognition of Tax-Exempt Status

On February 18, 1998, KASMA submitted to the IRS a Form 1023, Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code.  On the Form 1023 KASMA indicated that:

(1) KASMA is organized as a membership organization open to seniors ages 55 to 90 residing in the New York metropolitan area who pay its membership dues and support KASMA's purposes; and

(2) To become a member a senior must submit an application for membership and pay the following membership dues:  a $100 application fee for seniors ages 55 to 70 or a $150 application fee for seniors ages 71 to 90; a $30 annual fee; and a $10 fee every time a member dies.

KASMA's board of directors could reject an application for membership for cause and could terminate a membership if a member failed to pay the required membership dues for 90 days after receiving a written notice requesting payment.

KASMA listed three major planned activities:  burial benefits, services for seniors, and scholarships for students.

**[*5]** A.    <u>Burial Benefits</u>

KASMA members received the following "benefits" in exchange for their payment of dues:  (1) KASMA paid a burial benefit to the surviving family and encouraged other members to attend the funeral services and (2) members received a discount on funeral expenses and received information on burial plots and funeral arrangements.

KASMA described its burial benefits activity as follows:

1) Providing Burial grants & assistances
        - This program is intended to lift financial burdens off
        the back of the surviving families of decedent members
        by providing a lump-sum grant for the burial expenses.
        If no surviving families, the organization will take care
        of the funeral service.
        - The organization's officers carry out the program for
        people in the metropolitan NY area.

KASMA indicated that the burial benefits were limited to "[m]embers and members' surviving families" but noted that "exceptions will be made for those needy, poor seniors".

B.    <u>Services for Seniors</u>

KASMA described its services for seniors as follows:

2) Services for Seniors
        - Provides * * * on-going information regarding burial
        services, sites, costs, etc.

**[*6]**     - Provides referal [sic] services to seniors who needs [sic] various assistance from government agencies.  Help is provided over telephone or at office.
- Organize cultural and recreational actives [sic] for seniors. One cultural program was held for poor seniors at a Korean Restaurant in Flushing on 1/23/97.

C.     Scholarships for Students

KASMA stated that it would provide scholarship awards for needy students when KASMA "accumulates the necessary fund[s] for the awards."  On Schedule H, Organizations Providing Scholarship Benefits, Student Aid, Etc., to Individuals, of the Form 1023, KASMA reported:

> [The] [s]cholarship award plan is still in the process of being developed with the following guidelines:
>
> 1) $1,000 annual scholarship will be given to selected students as a gift at * * * KASMA's annual meeting;
> 2) A scholarship committee of five will make the selections; &
> 3) Application[s] for the award will be solicited by public notice in advance.

III.   IRS Recognition of KASMA as Tax Exempt

By letter dated April 27, 1998, Philip A. Millet, IRS exempt organization specialist, notified KASMA that the IRS was reviewing the Form 1023 and requested additional information to support its request to be recognized as a tax-exempt organization.

**[*7]** Specifically, Mr. Millet requested that KASMA provide a detailed description of its past, present, and proposed activities as well as the percentage of time and funds devoted to those activities. He also requested that KASMA amend its articles of incorporation to state that the purpose of the corporation is to provide burial benefits and assistance to the surviving families of deceased "seniors". Mr. Millet indicated that the initial language in the articles of incorporation did not meet the requirements of section 501(c)(3) because it did not limit KASMA's purposes to those specified in section 501(c)(3) and informed KASMA that if its purposes did not limit burial benefits and assistance to the surviving families of deceased seniors, the organization's charitable purpose would not be to benefit the aged and/or underprivileged.

KASMA responded to Mr. Millet's request by letter dated June 24, 1998, and described its activities as follows:

> I. Description of Activities
> > (1) Providing lump-sum burial grants and assistance to the surviving family members of the deceased seniors.
> > > (a) Burial grant is given to the surviving family relative[s] of the deceased seniors, 55-90 years, who reside in the NY metropolitan area and who are members of * * * [KASMA]. If there is no surviving family members, then * * * [KASMA] will arrange the burial ceremony for the deceased[.] Members must fill out an application form and pay membership dues. Each member also pays $30 toward the burial assistance

[*8]          whenever a member passes away.  As of the application date, 13 burial grants ($1,400-3,000) were made to the surviving family members to assist with the burial expenses.
(b) % of time devoted to this activity .....70%
(c) % of funds devoted to this activity .....60%

In the future, as reserve funds increase, * * * [KASMA] plans to expand it [sic] coverage of benefits to those non-member seniors who have no surviving family members.  Information will be made available to the community through news media.

(2) Services for Seniors
(a) This service is provided to members and non-members * * * alike.  Services often provided are information concerning burial sites, costs and funeral homes; SSI, medicaid, foodstamp [sic]; and recreational activities for the seniors such as free dinner[s] and cultural shows, short trips to countryside sight-seeing.
(b) % of time devoted to this activity .....25%
(c) % of funds devoted to this activity .....25%

In [the] future, * * * [KASMA] plan[s] to hire a full-time staff who will coordinate this service.

(3) Scholarship Award to Needy Students
(a) $1,000 scholarship will be given out to selected students in the New York Metropolitan area who are attending College or Graduate School who need financial aid.  (See Schedule H [Form 1023]) Availability of scholarship will be announced in the new[s] media.
(b) % of time devoted to this activity .....5%
(c) % of funds devoted to this activity .....5%

In the future, as reserve funds increase, * * * [KASMA] plans to allocate more money for scholarships.

In the letter KASMA stated that it had "no formal contracts with funeral homes" except "a verbal understanding with a funeral home that it will * * * [give]

**[*9]** about 10% discount in the burial expenses if the deceased senior was a member of * * * [KASMA]." KASMA noted that its "officers and directors are not directly related to the funeral home in question."

KASMA also complied with Mr. Millet's request and submitted an amended certificate of incorporation which in pertinent part stated that KASMA is formed "[t]o provide burial benefits and assistance to the surviving families of deceased seniors".

KASMA's attorney sent another letter to Mr. Millet dated July 29, 1998, which stated the following:

> 1) In the future, as reserve funds increase * * * [KASMA] will expand * * * [its] coverage of burial assistance to those non-member seniors over 60 years who have no surviving family members, and who left little money to cover his/her burial expenses. * * * [KASMA] will provide the necessary burial ceremony and burial arrangements for such persons.
>
> 2) If enough * * * [funds are] available in the future, * * * [KASMA] will also expand * * * [its] burial assistance to those non-member seniors over 60 years who left surviving family members but who are too poor to pay for the burial expenses.
>
>     *       *       *       *       *       *       *
>
> 5) If * * * [KASMA's] reserve funds increase, * * * [it] will also expand * * * [its] awards of scholarships for college students who are in need of financial assistance.

**[\*10]** After a telephone conversation with Mr. Millet, KASMA's representative sent a letter dated July 31, 1998, indicating that KASMA agreed to change its operating procedures so that all payments for the funeral expenses of its deceased members and nonmembers alike would be paid directly to the funeral homes or other service providers.

On August 10, 1998, the IRS issued a determination letter stating that on the basis of the information supplied and assuming its operations would be as stated in the application for recognition of exemption, the IRS determined KASMA was exempt from Federal income tax under section 501(a) as an organization described in section 501(c)(3).

IV.   IRS Final Determination Letter Dated February 19, 2004

KASMA received a final determination letter regarding its private foundation classification on February 19, 2004.  The IRS previously had determined that KASMA was an organization described in section 509(a)(2). However, in the final determination letter the IRS modified KASMA's foundation status to that of a public charity described in sections 509(a)(1) and 170(b)(1)(A)(vi), effective for years beginning May 1, 2001.  The letter also stated that KASMA's tax-exempt status under section 501(c)(3) was not affected.

[*11] V.    IRS Examination of KASMA

KASMA filed its annual return, Form 990, Return of Organization Exempt From Income Tax, dated September 6, 2013, for its taxable year starting on May 1, 2012, and ending on April 30, 2013 (TYE April 30, 2013).  On the Form 990 KASMA reported total revenue for TYE April 30, 2013, of $2,135,774 consisting of "membership dues" of $203,740 and unexplained "other contributions, gifts, grants, and similar amounts" of $1,932,034.  KASMA also reported total expenses of $2,083,507, of which $1,990,574 related to providing burial benefits.  For TYE April 30, 2013, KASMA did not report any revenue from fundraising.  KASMA also reported that it (1) provided burial benefits to 140 families during TYE April 30, 2013, and (2) had $536,014 in cash and $179,660 of net accounts receivable.

KASMA purchased a new office condominium in Flushing, New York, on February 24, 2008, and paid the full price without a mortgage.  On its Form 990 KASMA listed the book value of this condominium as $817,362.

By letter dated November 3, 2014, the IRS informed KASMA that it had been selected for an examination of its Form 990 for TYE April 30, 2013.  In that letter the IRS requested that KASMA submit certain documents so that the IRS could:  (1) ascertain whether it still met the organizational test, (2) verify that its

**[*12]** activities were exempt activities, and (3) determine that it had properly completed the Form 990 for TYE April 30, 2013.

VI.    KASMA's Operations During TYE April 30, 2013

During TYE April 30, 2013, KASMA operated as a membership organization open to anyone who was 55 to 90 years old residing in the New York City metropolitan area,[4] and charged a $150 membership application fee[5] to anyone 55 years or older who applied to join the organization. Upon the death of a member all remaining members were charged $10.[6]

When a member died, KASMA paid a certain amount to the funeral home towards the member's funeral expenses. The amount paid to the funeral home was determined on the basis of the length of time the deceased individual was a member of KASMA. KASMA paid a separate amount directly to the family of the

---

[4]Despite its name, The Korean-American Senior Mutual Association, there is not anything in the record that indicates that membership was limited to Korean-American seniors.

[5]The membership application fee collected during TYE April 30, 2013, was different than what KASMA reported on the Form 1023. On that form KASMA stated that the membership application fee varied depending on the age of the person applying for membership--ranging $100 to $150.

[6]In its protest letter dated November 27, 2015, KASMA stated that it assessed each member other fees every three months for the funeral costs incurred in the previous three months and that at that time each member was assessed approximately $300 to $350 per year.

**[*13]** deceased individual according to a Korean tradition. According to this tradition people who attend a funeral donate money to the bereaved family in an envelope. For example, KASMA paid $11,000 to the funeral home for the funeral bill and $3,210 to the deceased's family in accordance with the Korean tradition upon the death of a member who had been a member of KASMA for more than four years.

KASMA did not report on the Form 990 for TYE April 30, 2013, any activities with respect to its services for seniors or its scholarship awards to needy students. However, on its calendar year annual report for 2013 KASMA indicated that during September through December 2013 it had provided free legal consulting for 20 persons, "Social Work service" for 55 persons, voter registration assistance for 17 persons, and "Home Country visiting program" for 12 persons.

## VII. The IRS' Final Adverse Determination

On November 4, 2015, the IRS sent a letter to KASMA proposing to revoke its tax-exempt status under section 501(c)(3) because KASMA was not operated exclusively for one or more tax-exempt purposes. KASMA submitted a written protest to the IRS Appeals Office disputing the proposed revocation of its tax-exempt status.

**[\*14]** The IRS Appeals Office issued a final adverse determination dated September 6, 2017, and determined that KASMA does not qualify as exempt from Federal income tax under section 501(c)(3) because "[t]he primary activity of * * * [KASMA] is the provision of funds to defray or pay for the funeral costs of its members", which is not an exempt activity; therefore, KASMA is "not operated exclusively for one or more exempt purposes" under section 501(c)(3). The IRS granted KASMA's request for relief pursuant to section 7805(b) and revoked its tax-exempt status prospectively beginning on September 6, 2017.

Discussion

Section 7428(a)(1)(A) confers jurisdiction on the Court to make a declaration in a case of actual controversy involving a determination by the Secretary with respect to the initial qualification or continuing qualification of an organization as an organization described in section 501(c)(3) which is exempt from tax under section 501(a). The flush text of section 7428(a) provides in pertinent part that "a determination with respect to a continuing qualification * * * includes any revocation of or other change in a qualification".

Petitioner bears the burden of establishing that respondent's determination is erroneous. See Rule 142(a); Partners in Charity, Inc. v. Commissioner, 141 T.C. 151, 162 (2013). The parties submitted this case without a trial under Rule 122,

**[\*15]** and thus the evidentiary record consists solely of the administrative record. See Rule 217(b)(2).

Section 501(a) generally exempts from taxation an organization described in subsection (c). Section 501(c)(3) describes a qualifying organization in relevant part to include "[c]orporations * * * organized and operated exclusively for religious, charitable,[7] scientific, testing for public safety, literary, or educational purposes". An organization that qualifies under section 501(c)(3) not only is exempt from Federal income tax but also may solicit and accept donations which are normally deductible by the donor against his or her Federal tax. See sec. 170(a), (c)(2).

The IRS determined that KASMA did not operate exclusively for exempt purposes (operational test). Respondent maintains that "[t]he primary activity of * * * [KASMA] is the provision of funds to defray or pay for the funeral costs of its members."

The standard for tax-exempt status prescribed in section 501(c)(3) requires that an organization be "operated exclusively" for an exempt purpose. Section 1.501(c)(3)-1(c)(1), Income Tax Regs., describes the operational test as follows:

---

[7]In applying sec. 501(c)(3), the term "charitable" is used in its generally accepted legal sense and is not limited by the enumerated list in that section. Sec. 1.501(c)(3)-1(d)(2), Income Tax Regs.

**[\*16]** (c) Operational test--(1) Primary activities.--An organization will be regarded as <u>operated exclusively</u> for one or more exempt purposes only if it engages primarily in activities which accomplish one or more of such exempt purposes specified in section 501(c)(3). An organization will not be so regarded if more than an insubstantial part of its activities is not in furtherance of an exempt purpose.

In this regard the presence of a single substantial purpose that is not described in section 501(c)(3) precludes exemption from tax under section 501(a) regardless of the number or the importance of the purposes that are present and described in section 501(c)(3). See <u>Better Bus. Bureau v. United States</u>, 326 U.S. 279, 283 (1945).

"Under the operational test, the purpose towards which an organization's activities are directed, and not the nature of the activities themselves, is ultimately dispositive of the organization's right to be classified as a section 501(c)(3) organization exempt from tax under section 501(a)." <u>B.S.W. Grp., Inc. v. Commissioner</u>, 70 T.C. 352, 356-357 (1978). As the Court noted in <u>Partners in Charity, Inc. v. Commissioner</u>, 141 T.C. at 164: "Even in a commercial, profit-motivated context, such activities may be wholesome and commendable; but they will not support tax-exempt status unless they are undertaken to further an exempt purpose."

**[*17]** I.     <u>KASMA Makes Two Arguments</u>.

KASMA argues that respondent erred in revoking its tax-exempt status because it serves a public interest and its activities accomplish one or more of the exempt purposes specified in section 501(c)(3).  Alternatively, KASMA argues that respondent is equitably estopped from revoking its tax-exempt status because such revocation would be against the principles of equity jurisprudence.

For reasons more fully discussed below the Court concludes that (1) KASMA has not proven that respondent erred in determining that it was not operated exclusively for an exempt purpose and (2) respondent is not equitably estopped from revoking KASMA's tax-exempt status.

II.     <u>KASMA Is Not Operated Exclusively for an Exempt Purpose</u>.

As part of the application process, KASMA represented that its proposed activities were to provide (1) burial benefits for deceased members, which would be paid directly to the funeral home; (2) services for seniors, consisting of referral services, distributing burial information, and organizing cultural and recreational activities; and (3) scholarship awards for needy students.  KASMA also represented that it planned to expand its burial benefits to nonmember seniors with or without surviving family members and who left little money to cover their burial expenses.  However, KASMA operated differently from its proposed

**[*18]** activities stated in the Form 1023 and the letter dated July 31, 1998, in significant ways.

On the basis of the administrative record the Court concludes that KASMA was not operated exclusively for an exempt purpose because (1) it was not operated to serve a charitable class, (2) it operated in a commercial manner, and (3) its activities served a private rather than public interest.

A.    KASMA Did Not Operate To Serve a Charitable Class.

KASMA argues that it serves a recognized charitable class:  the elderly. However, because KASMA did not provide burial benefits to the elderly without regard to their ability to pay their funeral expenses or establish that the membership application fee of $150 and the other annual fees of $300 to $350 constituted nominal charges, KASMA did not operate to serve the recognized charitable class of the elderly.

Upon the death of a member, KASMA would pay an amount towards the funeral expenses directly to the funeral home.  The amount paid was calculated on the basis of the number of years the deceased had been a member.  KASMA also would pay to the surviving family of the deceased member an additional amount according to a Korean tradition.  KASMA did not pay these burial benefits to

[*19] nonmember seniors with or without surviving family members who had little money to cover burial expenses.

Respondent has recognized that an organization serves a charitable purpose when it provides for the special needs of the elderly where the elements of relief of distress and community benefit are present. See El Paso Del Aguila Elderly v. Commissioner, T.C. Memo. 1992-441, 1992 Tax Ct. Memo LEXIS 464, at *9-*10.[8] Respondent has ruled that an organization provides for the special needs of the elderly by relieving distress when it provides goods or services to the elderly at substantially below cost or without regard to an individual's ability to pay. See Rev. Rul. 79-18, 1979-1 C.B. 194 (determining that an organization was operated exclusively for charitable purposes when it provided specially designed housing to elderly persons at the lowest cost feasible and allowed tenants to remain in the housing if they became unable to pay the monthly fee); Rev. Rul. 77-246, 1977-2 C.B. 190 (determining that an organization was operated exclusively for a charitable purpose when it provided low cost transportation to senior citizens and

---

[8]While revenue rulings are not binding on the Court, the Court has held that the Commissioner is bound by longstanding and clearly articulated administrative positions set forth in revenue rulings. Rauenhorst v. Commissioner, 119 T.C. 157, 171 (2002). Respondent has recognized that in citing to the revenue rulings discussed he indicates that he agrees with those rulings. Respondent, however, argues that the positions articulated in those rulings are premised on facts that are different from how KASMA operates.

[*20] handicapped persons, an activity that was directed towards meeting the special needs of these charitable classes of individuals); Rev. Rul. 76-244, 1976-1 C.B. 155 (determining that an organization was operated exclusively for a charitable purpose when it provided home delivery of meals to the elderly and handicapped for a fee approximating the cost of the meals but reduced charges for those unable to pay the full amount and did not discontinue the service if a person became unable to pay); Rev. Rul. 75-385, 1975-2 C.B. 205 (determining that an organization was operated exclusively for a charitable purpose when it operated a rural rest home and admitted poor elderly individuals for two week stays for a nominal fee); Rev. Rul. 75-198, 1975-1 C.B. 157 (determining that an organization was operated exclusively for a charitable purpose when it established a senior center that provided information, referral, and counseling services relating to health, housing, finances, education, and employment, and specialized recreational services to senior citizens who did not have to be members to access the senior center and its services); Rev. Rul. 61-72, 1961-1 C.B. 188 (determining that an organization was operated exclusively for a charitable purpose when it provided a home for the aged at rates substantially less than the cost of the services furnished).

**[*21]** Unlike the organizations described in the revenue rulings, KASMA's primary activity was not directed towards meeting the special needs of the charitable class, the elderly, by relieving distress or providing a community benefit. KASMA provided burial benefits only to its members who paid dues, not to non-dues-paying seniors in the community. If a member failed to pay the required membership dues for 90 days after receiving a written notice requesting payment, KASMA's board of directors could terminate the membership and its obligation to pay any burial benefits.

Additionally, the amount of the burial benefit paid was calculated on the basis of the number of years the deceased member had paid the other fees rather than the inability of the deceased member to pay burial expenses. See Retired Teachers Legal Def. Fund, Inc. v. Commissioner, 78 T.C. 280, 290 (1982) ("[A]lthough all of the beneficiaries of * * * [the taxpayer's] purposes are elderly individuals, aid to pensioners without regard to need, has been held not a charitable purpose."). Further, there is not any evidence in the administrative record that the membership dues and the other annual fees that members were charged were nominal amounts.[9]

_____

[9]Petitioner in its opening brief cited Rev. Rul. 72-124, 1972-1 C.B. 145, and Rev. Rul. 79-17, 1979-1 C.B. 193, in support of its assertion that it served a

(continued...)

**[*22]** KASMA did not operate to provide burial benefits for elderly persons who were not members and who could not afford funeral expenses. KASMA represented in correspondence, in connection with its application for tax-exempt status, that it would use reserve funds to provide burial benefits for elderly persons

---

⁹(...continued)
charitable class. As indicated, revenue rulings are not binding on the Court. See supra note 8. Nevertheless, the facts in those revenue rulings are distinguishable from how KASMA operated. In Rev. Rul. 72-124, supra, the organization was formed by leaders of a church congregation to operate a home for the aged. The organization charged a fee to residents in the home; but once a person was admitted to the home, if they became unable to pay the monthly charges the organization would pay the monthly fees out of its reserves or seek support from local and Federal welfare programs, members of the church congregation, or general public. Id. The administrative record in this case indicates that if a member stopped paying dues, the member's membership was terminated. Thus when that person died, he or she was no longer eligible to receive a member's burial benefit. Further, the administrative record does not show that KASMA used its surplus funds to pay burial benefits for nonmembers who could not afford to pay them.

In Rev. Rul. 79-17, supra, the organization, a nonprofit hospice, was operated to provide both inpatient and outpatient assistance to patients of all ages who had been advised by a physician they were terminally ill. The organization's funds were derived from a reasonable fee charged for its services and donations by the public. The IRS ruled that by alleviating the mental and physical distress of persons terminally ill, the organization relieved the distressed within the meaning of sec. 1.501(c)(3)-1(d)(2), Income Tax Regs. KASMA does not alleviate the mental or physical distress of its members. KASMA does not provide any assistance to members who are terminally ill. Rather, through the collection of membership dues and other fees KASMA offers monetary assistance: the payment of a member's burial benefits calculated on the basis of the membership dues and other fees paid by that member during his or her membership.

[*23] who were not members and who could not afford funeral expenses, but it did not operate in accordance with that representation.

KASMA set its member fee structure in a way to cover its operating expenses and to accumulate substantial reserve funds. KASMA did not use the accumulated funds to provide burial benefits for elderly nonmembers who could not afford funeral expenses or members who were unable to pay all of their membership dues. See El Paso Del Aguila Elderly v. Commissioner, 1992 Tax Ct. Memo LEXIS 464, at *11-*12 (upholding a determination denying tax-exempt status to an organization which had been organized to provide a burial plan to the elderly at low cost because it operated to pay the burial plan only to its members who paid premiums). Instead, KASMA used a portion of the accumulated funds to purchase an office condominium with cash in 2008.

Additionally, KASMA did not serve the poor, another recognized charitable class. "Charitable" for purposes of section 501(c)(3) includes relief of the poor and distressed or of the underprivileged. Sec. 1.501(c)(3)-1(d)(2), Income Tax Regs. Although KASMA mentioned a goal of providing burial benefits to poor nonmembers, it did not. KASMA also represented that when it had accumulated sufficient funds it would provide scholarships to needy students. It did not. Mere statements of intent are insufficient to meet KASMA's burden of proving it

[*24] operated exclusively for charitable purposes.  See El Paso Del Aguila

Elderly v. Commissioner, 1992 Tax Ct. Memo LEXIS 464, at *12.

B.	KASMA Operated in a Commercial Manner.

KASMA operated in a fee-for-service manner.  When an organization

conducts a business in a commercial manner, that fact weighs heavily against

exemption.  Living Faith, Inc. v. Commissioner, 950 F.2d 365, 373 (7th Cir.

1991), aff'g T.C. Memo. 1990-484.  "The particular manner in which an

organization's activities are conducted, the commercial hue of those activities,

competition with commercial firms, and the existence and amount of annual or

accumulated profits, are all relevant evidence in determining whether an

organization has a substantial nonexempt purpose."  Id. at 372.  When an

organization engages in a substantial fee-for-service or other business activity and

the activity does not further the organization's exempt purpose, the organization is

not operated exclusively for an exempt purpose.  Sec. 1.501(c)(3)-1(c)(1), Income

Tax Regs.; see Partners in Charity, Inc. v. Commissioner, 141 T.C. at 168-169.

KASMA's burial benefits activity was conducted by collecting membership

dues and additional fees when members died and paying out burial benefits to

families of deceased members correlated with the number of years the member had

paid.  For TYE April 30, 2013, KASMA reported that it had paid burial benefits of

[*25] $1,990,574 to 140 families, or an average of $14,218 per family. KASMA operated in a commercial manner by providing burial benefits on the basis of payments over time by its members of membership dues and other fees.

    C.    <u>KASMA Did Not Serve a Public Interest</u>.

An organization is not operated for an exempt purpose unless it serves a public rather than private interest. <u>Redlands Surgical Servs. v. Commissioner</u>, 113 T.C. 47 (1999), <u>aff'd</u>, 242 F.3d 904 (9th Cir. 2001).

KASMA points to <u>Passaic United Hebrew Burial Ass'n v. United States</u>, 216 F. Supp. 500 (D.N.J. 1963), to support its argument that it did not operate for a "private benefit", or more specifically, that no part of its net earnings inured to the benefit of the private individuals who were members because no benefit to KASMA's members flowed until death. KASMA misconstrues the overlapping characteristics of the private benefit and private inurement prohibitions.

The Court has consistently recognized that while the prohibitions against private inurement and private benefits share common and often overlapping elements, the two are distinct requirements which must be satisfied independently. <u>Am. Campaign Acad. v. Commissioner</u>, 92 T.C. 1053, 1068 (1989). "The absence of private inurement of earnings to the benefit of a private shareholder or individual does not, however, establish that the organization is operated

[*26] exclusively for exempt purposes. Therefore, while the private inurement prohibition may arguably be subsumed within the private benefit analysis of the operational test, the reverse is not true." Id. at 1068-1069.

If the Court concludes that no prohibited inurement of earnings exists, it cannot stop there but must inquire further and determine whether a prohibited private benefit is conferred. See id. at 1069.

Therefore, assuming without deciding that none of KASMA's earnings inured to the benefit of a private shareholder or individual, the Court must still determine if it conferred a private benefit. KASMA paid burial benefits of deceased members. The administrative record does not reflect that KASMA provided other services for nonmember seniors or scholarship awards to needy students. Therefore, KASMA's primary activity conferred a private benefit. See Retired Teachers Legal Def. Fund, Inc. v. Commissioner, 78 T.C. 280 (deciding that an organization organized to preserve the financial stability of the New York City Teachers Retirement System and the contributions and pensions of retiree members of the system served the private interest of its members).

KASMA argues that its membership was open to "all seniors from the age of 55 to 90 years old, residing in the metropolitan New York area, who support the purposes of * * * [KASMA]" and that its organization is like the organization in

[*27] <u>Sound Health Ass'n v. Commissioner</u>, 71 T.C. 158, 185 (1978), which was granted tax-exempt status when the "class of possible members of the Association is, for all practical purposes, the class of members of the community itself." However, the organization in <u>Sound Health Ass'n</u> is distinguishable from KASMA because as a provider of medical services, it served the charitable purpose of promoting health in the communities it served. Sound Health Association operated to benefit the community by providing some health services for nonmembers on a fee-for-service basis, operating a subsidized dues program, running an emergency care facility that treated members and nonmembers regardless of their ability to pay, and offering educational programs to the public. <u>Id.</u> at 184-185. In contrast, KASMA did not provide burial benefits to nonmembers of the community and did not provide a subsidized dues program. KASMA has not established that it primarily benefited the community, and therefore it did not serve a public benefit.

The Court concludes that KASMA did not operate exclusively for one or more exempt purposes within the meaning of section 501(c)(3). Accordingly, KASMA has not met its burden of proving that respondent's determination to revoke its tax-exempt status effective September 6, 2017, and prospectively was erroneous.

[*28] III.     Respondent Is Not Equitably Estopped From Revoking KASMA's Tax-Exempt Status.

KASMA asserts that respondent should be equitably estopped from revoking its tax-exempt status because the IRS (1) requested KASMA to amend its articles of incorporation to reflect a charitable purpose, which it did, (2) granted KASMA tax-exempt status in 1998, and (3) affirmed KASMA's tax-exempt status in 2004. KASMA argues that it will suffer a detriment from the loss of the exempt status because it will lose exemptions from New York State and City sales tax and it will likely "lose some of the goodwill it has built up among its members and the local community".

Equitable estoppel is a judicial doctrine that "precludes a party from denying his own acts or representations which induced another to act to his detriment." Graff v. Commissioner, 74 T.C. 743, 761 (1980), aff'd, 673 F.2d 784 (5th Cir. 1982); see Megibow v. Commissioner, T.C. Memo. 2004-41, 2004 Tax Ct. Memo LEXIS 43, at *23. "The doctrine of [equitable] estoppel is based upon the grounds of public policy, fair dealing, good faith, and justice and is designed to aid the law in the administration of justice where without its aid injustice might result." Graff v. Commissioner, 74 T.C. at 761.

**[*29]** "[T]he Government may not be estopped on the same terms as any other litigant." Heckler v. Cmty. Health Servs. of Crawford Cty., Inc., 467 U.S. 51, 60 (1984); see OPM v. Richmond, 496 U.S. 414, 419 (1990). The general rule is that the Government is neither bound nor estopped by the acts of its officers and agents in entering into an agreement or arrangement to do or cause to be done what the law does not permit or sanction. Graff v. Commissioner, 74 T.C. at 762. Equitable estoppel has been applied against the Government only where justice and fair play require it. Id. at 761.

Invoking the doctrine of equitable estoppel against the Government "must be treated with the utmost caution, since its sanction in any case would result in having individual tax liability depend, not upon the factors and measures prescribed by Congress as applicable to all, but upon the statements and conduct of a particular Government officer in respect of each individual." Couzens v. Commissioner, 11 B.T.A. 1040, 1148 (1928). Thus the doctrine of equitable estoppel is applied against the Commissioner only with utmost caution and restraint. Schuster v. Commissioner, 312 F.2d 311, 317 (9th Cir. 1962), aff'g 32 T.C. 998 (1959), and rev'g 32 T.C. 1017 (1959); McCorkle v. Commissioner, 124 T.C. 56, 68 (2005); Hofstetter v. Commissioner, 98 T.C. 695, 700 (1992); Graff v.

**[*30]** Commissioner, 74 T.C. at 761; Estate of Emerson v. Commissioner, 67 T.C. 612, 617 (1977).

The essential elements of estoppel are: "(1) [t]here must be a false representation or wrongful misleading silence; (2) the error must be in a statement of fact and not in an opinion or a statement of law; (3) the person claiming the benefits of estoppel must be ignorant of the true facts; and (4) he must be adversely affected by the acts or statements of the person against whom an estoppel is claimed." Estate of Emerson v. Commissioner, 67 T.C. at 617-618. The difference between mistakes of fact and mistakes of law is fundamental when dealing with the doctrine of equitable estoppel. See, e.g., Ginsberg v. Commissioner, 24 T.C. 273, 278 (1955).

The IRS' decision to grant KASMA tax-exempt status in 1998 was a mistake of law by the IRS, not a mistake of fact. Equitable estoppel does not bar or prevent the IRS from correcting a mistake of law. Auto. Club of Mich. v. Commissioner, 353 U.S. 180, 183-184 (1957); Schuster v. Commissioner, 312 F.2d at 317; see Wilkins v. Commissioner, 120 T.C. 109, 113 (2003).

To qualify as an exempt organization described in section 501(c)(3), a corporation must demonstrate that it is organized and operated exclusively for religious, charitable, scientific, educational, or other specified exempt purposes.

[*31] KASMA was not operated exclusively for any of the purposes indicated in section 501(c)(3) because KASMA was a membership organization whose main purpose was to provide burial grants for the private benefit of its members. Therefore, the law does not permit KASMA to qualify as an exempt organization described in section 501(c)(3).

By granting KASMA tax-exempt status the IRS incorrectly applied the law requiring that a corporation operate exclusively for tax-exempt purposes. The IRS may correct mistakes of law "even where a taxpayer may have relied to his detriment on the * * * [IRS'] mistake." Dixon v. United States, 381 U.S. 68, 73 (1965); see Greenfeld v. Commissioner, T.C. Memo. 1966-83, 1966 Tax Ct. Memo LEXIS 201, at *5 (holding the IRS was not estopped from disallowing net losses after failing to make such changes during audits of prior year tax returns). The IRS has the power to correct mistakes of law because an IRS employee by neglect or otherwise cannot bind the IRS to an erroneous interpretation of law. Graff v. Commissioner, 74 T.C. at 762.

Thus, the IRS is not estopped from correcting the mistake of law. Accordingly, the Court concludes that equitable estoppel is not applicable and respondent is not estopped from determining that KASMA is not an organization described in section 501(c)(3).

**[\*32]** The Court has considered all of the arguments made by the parties and, to the extent they are not addressed herein, the Court finds them to be moot, irrelevant, or without merit.

<u>Decision will be entered for</u> <u>respondent</u>.